## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LARRY PITT & ASSOCIATES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 13-2398** |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **LUNDY LAW, LLP, and L. LEONARD** | ) | |
| **LUNDY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED VERIFIED COMPLAINT

Plaintiff Larry Pitt & Associates ("Pitt Law"), by and through its undersigned attorneys, brings the following claims against Defendants Lundy Law, LLP and L. Leonard Lundy (collectively "Defendant Lundy").

## NATURE OF THE CASE

1. This is an action for unfair competition under Pennsylvania common law; tortious interference with prospective economic advantage; violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2; violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.*; violation of Pennsylvania's Dragonetti Act, 42 Pa. C.S.A. § 8351; and common law abuse of process.

2. This action seeks actual and punitive damages, as well as injunctive relief and disgorgement of profits.

3. As set forth below, this action arises out of the orchestrated campaign of Defendant L. Leonard Lundy, Defendant Lundy Law, LLP, and others to attempt to monopolize and monopolize the market for the provision of legal representation in the areas of small personal injury and social security disability and workers' compensation law in the Greater Philadelphia

area.  Defendants have endeavored to achieve this goal employing a panoply of predatory conduct aimed at injuring Plaintiff Pitt Law and other similarly situated competitors.  This predatory conduct has included Defendant Lundy entering into exclusive and perpetually renewable contracts for legal advertising with media outlets and others that prevent the essential advertisement of legal services by Plaintiff Pitt Law and others in highly coveted mass reach media outlets in the Greater Philadelphia area as defined herein.  This predatory conduct has also included Defendant Lundy making false and misleading statements in its advertisements to steer clients away from its competitors, and filing meritless intellectual property claims in this Court, including a frivolous request for injunctive relief against Pitt Law.  The baselessness of those claims was affirmed when Defendant Lundy inexplicably withdrew the claims recently, but only after Pitt Law had incurred substantial expense in defense thereof.

## JURISDICTION AND VENUE

4. The amount in controversy exclusive of interest and costs exceeds the sum or value of $75,000.

5. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, in that the claims arise under the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2 and the Lanham Act, 15 U.S.C. § 1051, *et seq*.  This Court has pendent jurisdiction over the state law claims which arise under the laws of Pennsylvania, pursuant to the principles of supplemental jurisdiction set forth in 28 U.S.C. § 1367.

6. Venue is proper in this district under 28 U.S.C. § 1391(b), as all Defendants reside in this district and events or omissions giving rise to these claims occurred in this district.

7. This Court has personal jurisdiction over Defendant L. Leonard Lundy, as he is located in and conducts business in this district.

## THE PARTIES

8. Plaintiff Larry Pitt & Associates is a Pennsylvania professional corporation having its principal place of business at 1918 Pine Street, Philadelphia, Pennsylvania, 19103.

9. Defendant Lundy Law, LLP is a Pennsylvania limited liability partnership having a principal place of business at 1635 Market Street, 19th Floor, Philadelphia, Pennsylvania, 19103.

10. Defendant L. Leonard Lundy is a principal with Lundy Law and its Managing Partner, and resides in this district.

## INTERSTATE COMMERCE

11. Defendant Lundy maintains offices in Pennsylvania, New Jersey, and Delaware.

12. Defendant Lundy runs advertisements that appear in Pennsylvania, New Jersey, and Delaware.

13. Through advertisements, referral sources, and other means, Defendant Lundy actively solicits potential clients, secures business, and collects fees from out-of-state, *i.e.*, from clients who reside in New Jersey and Delaware.

14. Defendant Lundy collects referral fees from out-of-state lawyers.

15. The types of legal services that Defendant Lundy provides involve corporations, insurance companies and defense counsel with offices throughout the country, and national federal aid programs such as Medicare and Medicaid.

16. The business activities of Defendant Lundy that are the subject of this Complaint substantially affect interstate commerce and use communications in interstate commerce, including the U.S. mail.

## THE RELEVANT MARKETS

17. For purposes of each of Plaintiff Pitt Law's antitrust claims herein, the relevant line of

3

commerce in which to assess the anticompetitive effects of Defendant Lundy's wrongful conduct is the market for legal services provided by small personal injury and social security disability and workers' compensation law firms in the Greater Philadelphia area as defined herein.

18. Upon information and belief, the prices charged for legal services provided by small personal injury and social security disability and workers' compensation law firms are not constrained by other types of law firms.

19. Consumers primarily base their decision for legal representation by small personal injury and social security disability and workers' compensation law firms on brand name recognition and/or recall.

20. For purposes of each of Plaintiff Pitt Law's antitrust claims herein, mass reach, constant messaging, saturation advertising for legal services provided by small personal injury and social security disability and workers' compensation law firms is a relevant market.

21. Defendant Lundy has admitted that Plaintiff Pitt Law and Lundy Law, LLP compete for the same advertising "in connection with services customary in the legal services [market] including, and specifically the identical area of personal injury legal services advertised for and offered by . . . Lundy Law."

22. Upon information and belief, advertisers of other goods or services do not constrain the prices charged for the advertising of legal services by small personal injury and social security disability and workers' compensation law firms.

23. The relevant geographic market in which to assess the anticompetitive effects of Defendant Lundy's wrongful conduct in both relevant lines of commerce is southern New Jersey, northern Delaware, Berks, Bucks, Delaware, Chester, Montgomery and Philadelphia Counties ("Greater Philadelphia Region").

4

## FACTS GIVING RISE TO THESE CLAIMS

24. Pitt Law is a Pennsylvania-based law firm concentrating in small personal injury and social security disability and workers' compensation law, providing legal representation in the Greater Philadelphia Region.

25. Lundy Law, LLP is a Pennsylvania law firm concentrating in small personal injury law, and claiming to also concentrate in social security disability and workers' compensation law, providing legal representation in the Greater Philadelphia Region.

26. Defendant Lundy has admitted that Pitt Law "is in direct competition with . . . Lundy Law in the same geographic area for the same legal services."

27. Clients of small personal injury and social security disability and workers' compensation law firms typically experience an *ad hoc* need for such legal services and brand name recognition is the principal factor in consumer choice of legal service providers in this market.

### Legal Advertising

28. It is a common and desired practice for small personal injury and social security disability and workers' compensation law firms of this nature, like Defendant Lundy and Plaintiff Pitt Law, to advertise their legal services through mass reach outlets, using constant messaging, saturation advertising in order to effectively compete.

29. The purpose of such advertising for law firms of this type is to obtain brand name recognition among potential clients and other referral sources.

30. Mass reach, constant messaging, saturation advertising is the primary source of clients for small personal injury and social security disability and workers' compensation law firms. Such advertising has proven in practice to be the most effective and efficient way for such law firms to establish and reinforce brand name recognition, and to distribute information about their

5

services to consumers,  Without it, law firms practicing in these areas are unable to compete effectively.

31. Such advertising is done in the following types of media outlets:  public transportation, radio, and in and around sporting events and concert venues.

32. The most highly coveted mass reach, constant messaging, saturation advertisements are those: (1) placed on the exteriors of buses; (2) aired on radio in prime time slots, such as rush hour and during traffic updates; and (3) displayed inside arenas where sporting and concert events are held.

33. The effectiveness and efficiency of the above forms of advertising is far greater than that of other forms of advertising like Yellow Pages, stationary billboards and the internet. Therefore, advertisements in those categories are both unique and essential and not reasonably interchangeable with other forms of advertising.

34. Southeastern Pennsylvania Transportation Authority ("SEPTA") is a metropolitan transportation authority that operates various forms of public transit, including trains and buses, that serve 3.9 million people in the Greater Philadelphia Region.  Average weekday ridership across the SEPTA system is over 1 million passengers.

35. Historically, Pitt Law and other small personal injury and social security disability and workers' compensation law firms have advertised their legal services with SEPTA, including on the exteriors of buses, interiors of buses and at bus stops.  This practice has taken place for at least ten years until recently, for reasons explained herein.

36. Plaintiff Pitt Law and other small personal injury and social security disability and workers' compensation law firms that historically have advertised their services on the exteriors of buses have never sought to restrict consumer access to competitors' advertisements through

6

exclusive contracts in perpetuity.

37. Advertising on the exteriors of buses is one of the most effective and efficient forms of advertising for legal services for small personal injury and social security disability and workers' compensation law firms to use in order to achieve brand name recognition.

38. Buses serve as unique moving billboards, particularly in high density neighborhoods, enabling maximum, repetitive brand name recognition saturation that is targeted to a far greater number of prospective clients than is possible through other forms of advertising, like stationary billboards at a single location, Yellow Pages and the internet.

39. The exteriors of buses are viewed by individuals driving in their cars or walking on the streets who may not ride buses and thus are not exposed to advertising on the interior of buses; by individuals who may not attend sporting or concert events and thus are not exposed to advertising in that other essential media outlet; by individuals who may not own a radio and thus are not exposed to advertising in that media outlet; and by individuals who may not see stationary billboards at a single location and thus are not exposed to advertising in that limited medium, because they either do not drive or drive in areas without such billboards.  Exterior bus advertising uniquely reaches a mass audience of drivers and pedestrians with constant brand name messaging without the consumer necessarily even riding the bus.  It is virtually impossible to live in the relevant geographic market and not be continually exposed to exterior bus advertising.

40. SEPTA buses run on 170 bus routes throughout the Greater Philadelphia Region. Hundreds of buses operated by SEPTA are, by law, the only buses serving local routes in the Greater Philadelphia Region.  Therefore, mass reach, constant messaging, saturation advertising on bus exteriors is essential for such law firms, like Pitt Law, to effectively compete in the

EAST\56504017.7

relevant market.

41. As has been stated by Titan, the national advertising agency that has the exclusive right to sell advertisements on behalf of SEPTA, "exterior bus advertising is the ultimate mass reach medium." Titan has further stated that, nationally, "over 2.4 million individuals see a Titan bus ad every day" and "over 74 million individuals see a Titan bus ad every month" and "over 880 million individuals see a Titan bus ad every year."

42. Accordingly, advertising on the exteriors of buses is a significant decision influencer for a large segment of potential clients of small personal injury and social security disability and workers' compensation law firms.

43. Historically, Plaintiff Pitt Law has advertised its legal services with SEPTA, including on the exteriors and interiors of buses since at least 2007.

44. Berks Area Regional Transportation ("BARTA") is a transportation authority that provides bus and shuttle service in Berks County, Pennsylvania, with its primary services in the city of Reading, Pennsylvania. There are approximately 3.1 million riders per year on BARTA buses.

45. Historically, Plaintiff Pitt Law has advertised its legal services with BARTA, including on the exterior and interior of buses.

46. Historically, Plaintiff Pitt Law has also advertised on radio during rush hour and other prime time slots. These are the most influential and sought after advertising spots in these media outlets.

47. Plaintiff Pitt Law has also advertised on roadside stationary billboards, which have limited effectiveness because they are only viewed by passing motorists at a particular location

8

where billboards are permitted.  Prospective clients that do not drive would not be exposed to such billboards.

48. Because advertisements in these forms of media often grow stale and tired if they are run continuously, it is common practice to run such advertisements for several months, stop the advertisements, and then re-start the advertisements to avoid such oversaturation.  This method achieves the highest level of effectiveness for this type of mass reach, constant messaging, saturation advertising.

49. The perception and understanding among small personal injury and social security disability and workers' compensation law firms in the relevant geographic market, including Defendant Lundy and Plaintiff Pitt Law, is that advertising on the exteriors of buses, on prime time radio, and inside arenas during sporting and concert events are the most effective and efficient ways of achieving brand name recognition and exposure to consumers.  Accordingly, such law firms historically have competed vigorously among each other for the right to purchase such essential advertisements.

50. Defendant Lundy's own advertising practices demonstrate that these types of advertisements are perceived by it as the most effective and efficient methods of advertising for law firms in the relevant markets.

51. Defendant Lundy does not advertise in the Yellow Pages and, upon information and belief, has significantly reduced its advertising other than the mass reach, constant messaging, saturation advertising described above.

52. Upon information and belief, Defendant Lundy focuses the majority of its advertising efforts on securing the mass reach, constant messaging, saturation advertising described above.

9

53. Because other types of advertisements are not viable substitutes for the mass reach, constant messaging, saturation advertising described above, small personal injury and social security disability and workers' compensation law firms would not respond to an increase in the price of these advertisements (if they were available) by turning to other, less effective types of advertisements.

54. Instead, the response to such a price increase would be free and unrestrained competition among such firms for the purchase of the most effective and efficient types of advertisements.

55. Such competition is eliminated when a single small personal injury and social security disability and workers' compensation law firm enters into agreements providing for large, economically unjustified payments for the exclusive right to run the above described types of advertisements because, as a result of the terms of such agreements, competing law firms are barred from even attempting to buy such advertising, which is locked up by the firm with such exclusive rights.

56. The existence of such agreements in the relevant markets also means that the sellers of the advertisements do not, and cannot, view other law firms as potential substitute buyers.  Nor can prospective clients effectively choose among such law firms for such legal services because they are effectively not known to them by brand name.

### Defendant Lundy's Exclusive Advertising Contracts

57. During at least the past year and one half, Defendant Lundy has commenced a predatory advertising campaign by entering into exclusive contracts for advertising in these same forms of select mass reach, constant messaging media outlets and spots, including with SEPTA and BARTA for the exteriors of buses, and at sports and concert arenas, like the Wells Fargo Center in Philadelphia, and during the prime rush hour on KYW Newsradio.

58. Many of Defendant Lundy's contracts for advertising in these media forms are exclusive, thereby preventing any and all other competing legal service providers, including Pitt Law, from advertising in these outlets or media entirely.

59. Defendant Lundy's exclusive advertising contracts are for a period of at least one year, with automatic, unlimited renewal for additional one year periods. Because there is no limit on the renewal provision, Defendant Lundy's exclusive advertising contracts have the potential to exist in perpetuity.

60. Defendant Lundy has entered into other contracts for advertising that have restrictive provisions, preventing any and all other legal service providers from advertising during appropriate and optimal times.

61. Upon information and belief, L. Leonard Lundy has been personally involved in negotiating the exclusive advertising contracts in question and has authorized their execution on behalf of Lundy Law, LLP.

62. By securing the exclusive advertising contracts described above, Defendant Lundy has made its name and branding ubiquitous in the relevant markets, at the expense of its competitors' names and branding.

63. Plaintiff Pitt Law attempted to renew its own advertising contracts, including at SEPTA, BARTA and KYW, and was substantially foreclosed as a direct result of Defendant Lundy's anticompetitive conduct.

64. Other small personal injury and social security disability and workers' compensation law firms in the relevant geographic market, including Hill & Associates, P.C.; Spear, Greenfield & Richman, P.C.; and others, have similarly attempted to renew or purchase advertising and have been substantially foreclosed as a direct result of Defendant Lundy's anticompetitive conduct.

11

## Defendant Lundy's Exclusive Deal with Titan and SEPTA

65. Titan is the national advertising agency that has the exclusive right to sell advertisements on behalf of SEPTA.

66. Defendant Lundy, Titan, and SEPTA have conspired to foreclose competition in the market for legal services provided by small personal injury and social security disability and workers' compensation law firms in the Greater Philadelphia Region; and the market for advertising for legal services, defined herein, provided by small personal injury and social security disability and workers' compensation law firms in the Greater Philadelphia Region.

67. Specifically, Defendant Lundy, Titan, and SEPTA have engaged in concerted action to preclude any law firm, other than Lundy Law, LLP, from purchasing the highly coveted advertisements that SEPTA places on the exteriors of its buses.

68. Since approximately January 2012, Defendant Lundy has had the exclusive right to place advertisements for legal services on the exteriors of all SEPTA buses.

69. When Plaintiff Pitt Law attempted to renew its contract for advertisements on the exterior of SEPTA buses, it was informed that Defendant Lundy's advertising contract with SEPTA prevented SEPTA from contracting with any other legal service providers for advertising anywhere on the exteriors of buses, for at least one year, with unlimited one-year renewal options.

70. In the past, Defendant Lundy had placed advertisements on the exteriors of buses on a non-exclusive basis, such that other law firms were permitted to seek and bid competitively for the right to place such advertisements, including Pitt Law, Leonard K. Hill, Rand Spear, and others.

12

71. As a result of Defendant Lundy's exclusive agreement with SEPTA, Plaintiff Pitt Law and all other competitors in the relevant market are now completely foreclosed from purchasing advertisements on the exteriors of SEPTA buses in perpetuity.

72. As a result of Defendant Lundy's exclusive agreement with SEPTA, SEPTA is forgoing revenue it could otherwise generate by selling available advertising space to Plaintiff Pitt Law and similar law firms on a competitive basis, including on the exterior of buses that do not contain Lundy Law advertisements.  Under the terms of Defendant Lundy Law's exclusive agreement with Titan and SEPTA, even such unused inventory advertisement space is not available to any other lawyers.

73. Defendant Lundy sought and obtained the exclusive right to advertisements on the exteriors of SEPTA buses at some time during 2011, effective in January 2012.

74. Defendant L. Leonard Lundy's daughter, Sara Lundy, is an Account Executive at Titan.

75. L. Leonard Lundy's daughter began working for Titan in approximately March 2011.

76. At the time when L. Leonard Lundy's daughter joined Titan, numerous law firms, including Lundy Law, LLP, Plaintiff Pitt Law, Hill & Associates, P.C. and Spear, Greenfield & Richman, P.C., and others, were able to, and some did, purchase advertisements on the exteriors of SEPTA buses.

77. Less than a year after L. Leonard Lundy's daughter began working for Titan, an agreement was entered into among SEPTA, Titan and Defendant Lundy under which no other legal service provider except Defendant Lundy would be permitted to place any advertisements on the exteriors of buses.

78. L. Leonard Lundy's daughter has responsibility for selling advertisements through Titan on behalf of SEPTA.

13

EAST\56504017.7

79. As an Account Executive for Titan, L. Leonard Lundy's daughter has access to competitive information belonging to advertisers she represents, including small personal injury and social security disability and workers' compensation law firms that advertise with SEPTA through Titan, including Pitt Law, Hill & Associates, P.C.; Spear, Greenfield & Richman, P.C.; and others.

80. Such information includes data related to advertising purchases, advertising strategies, advertising copy, and other commercially sensitive information.

81. Other law firms have attempted to purchase advertising on the exteriors of SEPTA buses, and have been told, either by L. Leonard Lundy's daughter herself or by other Titan representatives, that they are foreclosed from purchasing any such advertisements because Titan and SEPTA have an exclusive advertising agreement with Defendant Lundy under which no other providers of legal services are permitted to purchase advertisements on the exteriors of buses.

82. Specifically, Rand Spear, Founder and Principal of Spear, Greenfield & Richman, P.C., purchased advertisements on the exteriors of SEPTA buses each year for six-month periods on approximately forty buses at a time from approximately 2006 until October 2011.

83. Numerous clients who contacted and ultimately retained Mr. Spear during this period told Mr. Spear that they had learned about his law firm from seeing his name, face, and telephone number on the exteriors of SEPTA buses.

84. Mr. Spear viewed, and continues to view, advertisements on the exteriors of buses as the most effective and efficient form of advertising for firms such as his, because they reach an audience consisting of individuals who may not have a computer or watch television, and thus are unable to find his advertisements on the internet, television or have access to Yellow Pages.

14

85. In early 2012, Mr. Spear contacted John Roach of Titan to purchase the same advertisements he had been running the previous five years.

86. Mr. Roach told Mr. Spear that he could no longer place advertisements on the exteriors of buses because of an exclusive agreement Titan and SEPTA had with Lundy Law, LLP.  He also told Mr. Spear that L. Leonard Lundy's daughter, Sara Lundy, was handling the Lundy Law account.

87. In response, Mr. Spear told Mr. Roach that he would be willing to pay a higher rate for the exterior bus advertisements.  Mr. Roach told Mr. Spear that even a higher rate could not buy him any advertisements on the exteriors of any SEPTA buses, because Lundy Law had an exclusive agreement for such advertisements that it could renew yearly.  Mr. Roach said to Mr. Spear that Lundy Law had "locked out all other lawyers" from advertising on the exterior of SEPTA buses "forever."

88. Mr. Spear also asked Mr. Roach if he could, at least, buy the inventory on the exterior of buses that did not contain a Lundy Law advertisement.  Mr. Roach told him that such unused inventory was also not available under the terms of Lundy Law's exclusive agreement with Titan and SEPTA.

89. In early 2013, Mr. Spear again called Titan to inquire about renewing his advertisements on the exteriors of buses.

90. A representative of Titan told him that Defendant Lundy still had the exclusive right to place such advertisements, and that no other provider of legal services was permitted to purchase any advertisements on the exteriors of SEPTA buses.

91. Leonard K. Hill, Managing Partner of Hill & Associates, P.C., recently met L. Leonard Lundy's daughter. She introduced herself and stated that she was an Account Executive for Titan.

92. Leonard K. Hill, who advertises his law firm in various media, was made aware by Sara Lundy that Titan has the exclusive right to sell advertisements on behalf of SEPTA.

93. Leonard K. Hill told L. Leonard Lundy's daughter that he intended to contact Titan to inquire about commencing advertising on the exteriors of SEPTA buses.

94. L. Leonard Lundy's daughter told Leonard K. Hill that it was impossible for him to purchase such advertising, because her father and his law firm, Defendant Lundy Law, have an exclusive agreement with Titan and SEPTA, which gives Defendant Lundy the sole right to place advertisements on the exteriors of SEPTA buses.

95. L. Leonard Lundy's daughter gave Leonard K. Hill her business card and she stated that he was welcome to contact her about other advertisements on the interiors of buses and trains, *e.g.*, which Leonard K. Hill believed were the far less effective and less efficient advertisements than those on the exterior of SEPTA buses.

96. Leonard K. Hill engaged Titan for purposes of seeking advertising opportunities not currently foreclosed by Defendant Lundy's exclusive agreement, based on Titan's promise that he may later be able to secure advertising on the exteriors of buses if and when Defendant Lundy's agreement expires and Defendant Lundy decides not to renew it.

97. While meeting with L. Leonard Lundy's daughter and another Titan representative, Leonard K. Hill inquired about what he believed to be a conflict of interest resulting from L. Leonard Lundy's daughter's simultaneous representation of her father's law firm and other, competing law firms such as Hill & Associates, P.C.

16

98. Sara Lundy responded to Leonard K. Hill that she believed she could represent both Mr. Hill's firm and her father's firm and that would not be a conflict of interest.

99. Other competitors of Plaintiff Pitt Law and Defendant Lundy have also contacted Titan to inquire about advertisements on the exteriors of SEPTA buses, and been referred to L. Leonard Lundy's daughter as the Titan representative handling such advertising services.

100. L. Leonard Lundy's daughter has told other competitors of Plaintiff Pitt Law and Defendant Lundy about her father's exclusive deal with SEPTA and that, because of it, they would be unable to advertise on the exterior of buses.

101. Other competitors have voiced their concern and discomfort to Titan about L. Leonard Lundy's daughter simultaneously handling both her father's advertising with SEPTA and the advertising of other, competing law firms.  Such concerns were not addressed by Titan.

102. L. Leonard Lundy's daughter continues to serve as an Account Executive at Titan for both her father's law firm and competing law firms as to advertisements with SEPTA.

### Defendant Lundy's Other Exclusive Advertising Deals

103. Defendant Lundy has also entered into other advertising agreements under which no other legal service providers are permitted to purchase advertising in other mass reach media outlets.

104. When Plaintiff Pitt Law attempted to renew its contract for the highly coveted advertisements on the exterior of BARTA buses in Berks County, Pennsylvania, Pitt Law was informed that Defendant Lundy's advertising contract with BARTA prevented BARTA from contracting with any other legal service providers for advertising anywhere on the exterior of buses, for at least one year, with unlimited one year renewal options.

17

105. In addition, when Plaintiff Pitt Law attempted to secure advertising with KYW Newsradio for advertising around highly desirable traffic and weather spots, time checks and traffic sponsorships, Pitt Law was informed that Defendant Lundy's advertising contract with KYW Newsradio prevented KYW Newsradio from contracting with any other legal service providers for any and all of those prime time slots, for at least one year, with unlimited one year renewal options.

106. Finally, when Plaintiff Pitt Law attempted to secure advertising with the Wells Fargo Center, it was informed that Defendant Lundy's advertising contract with the Wells Fargo Center prevented the Wells Fargo Center from contracting with any other legal service providers for any form of advertising in any location within the massive arena, for at least one year, with unlimited one year renewal options.

107. Other law firms have attempted to purchase advertising with the Wells Fargo Center and have been told that they are foreclosed from purchasing any such advertisements because the Wells Fargo Center has an exclusive advertising agreement with Defendant Lundy Law under which no other providers of legal services are permitted to purchase advertisements with the Wells Fargo Center.

### Anticompetitive Effects of Defendant Lundy's Exclusive Advertising Contracts

108. The effect of Defendant Lundy's conduct in securing the exclusive advertising rights described above has been to  reduce or eliminate competition in the relevant markets.

109. Significantly, Defendant Lundy's exclusive advertising contracts described above have no procompetitive effects, *e.g.*, assuring supply, price stability, outlets, investment, or best efforts, or generally encouraging competition on the merits.  Instead, they have the sole anticompetitive effect of preventing Pitt Law and other actual and potential competitors from

18

obtaining brand name recognition and distributing information about their services to potential clients in a cost efficient manner.

110. At the same time, Defendant Lundy's exclusive advertising contracts limit consumer choice by severely restricting potential clients' exposure to the names of, and information about, law firms other than Defendant Lundy; thereby reducing consumer bargaining power on the cost paid for their legal services.

111. Access to these media outlets and their mass reach, constant messaging, saturation advertising is an essential facility needed to effectively compete in the market for the advertising of legal services by such small personal injury and social security disability and workers' compensation law firms in the relevant geographic market.

112. The advertising outlets with which Defendant Lundy has obtained exclusive agreements are well established as the most effective, efficient, and popular outlets through which small personal injury and social security disability and workers' compensation law firms in the relevant geographic market advertise their legal services.

113. If Defendant Lundy's competitors were not excluded from purchasing these advertisements, as was the case in the past, they would pay commercially reasonable and economically justified rates for the right to place them.

114. Significantly, Defendant Lundy has admitted that since May 2011 it has been the "predominant advertiser of personal injury services."

115. Defendant Lundy has also admitted that, "Lundy Law has been almost continually the most prominent largest legal advertisers in Southeastern Pennsylvania, Southern New Jersey and Delaware for years and, thus, one of the best known firms in the tri-state area."

116. For at least the past year, Defendant Lundy has engaged in a predatory campaign with

19

others to eliminate competition from Pitt Law and other small personal injury and social security disability and workers' compensation law firms and to harm Pitt Law as a direct competitor. Defendant Lundy's predatory campaign has included the attempted monopolization and monopolization of advertising of legal services in small personal injury and social security disability and workers' compensation law in the Greater Philadelphia Region.  Defendant Lundy's unlawful conduct has, in fact, caused harm to Pitt Law and has significantly impacted competition in the advertising of legal services for small personal injury and social security disability and workers' compensation law firms in the relevant geographic market.  As L. Leonard Lundy has publicly vowed, "I believe that, at the end of the day, the dominant brands will succeed."

117. Upon information and belief, L. Leonard Lundy has been personally involved in developing and approving Defendant Lundy Law, LLP's advertising and marketing strategies, including masterminding Defendant Lundy's predatory campaign to monopolize and to attempt to monopolize the market in advertising of legal services.  This campaign is intended to eliminate and/or minimize the competitive threat posed by Pitt Law and other similar law firms.

118. Upon information and belief, Defendant Lundy makes large, economically unjustified payments to media outlets that are above market prices to induce them to enter into these predatory exclusive contracts in perpetuity.

119. Upon information and belief, Defendant Lundy Law, LLP and Defendant L. Leonard Lundy have instigated and spearheaded a boycott by media outlets of Pitt Law and other similar law firms.  Certain media outlets, at the urging and with the participation of Defendant Lundy, have combined and conspired to deal only with Defendant Lundy and not to deal with Pitt Law or any other similar law firm for certain forms of highly sought after mass reach, constant

20

messaging, saturation advertising of legal services.

120. Upon information and belief, certain media outlets have agreed and conspired to assist Defendant Lundy in its efforts to exclude Pitt Law and other similar law firms from the advertising of legal services by the mass reach, constant messaging, saturation methods of advertising described above. This has been accomplished by encouraging and accepting unusually high and economically unjustified payments that are above market prices in return for agreeing to deal only with Defendant Lundy and not his competitors.

## Other Predatory Conduct

121. Defendant Lundy, with others, has also engaged in further forms of predatory conduct to eliminate or undermine Pitt Law's advertising and otherwise competitively harm Pitt Law and similar law firms, including, upon information and belief, employing other forms of illegal, fraudulent and unethical conduct in concert with others, including medical healthcare providers.

122. This conduct has also included, but is not limited to, false and unethical advertising and filing frivolous litigation against Pitt Law.

123. Defendant Lundy advertises itself through mass reach media outlets as a law firm with capabilities to handle workers' compensation and social security disability matters in Pennsylvania, New Jersey, and Delaware.

124. For example, many of Defendant Lundy's advertisements use some combination of the phrase "INJURY, DISABILITY & WORKERS' COMPENSATION" and indicate "PA • NJ • DE" as the jurisdictions in which Defendant Lundy handles such matters.

125. Defendant Lundy's advertisements appearing on the exteriors of SEPTA buses characterize Defendant Lundy as "INJURY, DISABILITY & WORKERS' COMPENSATION LAWYERS" practicing in "PA • NJ • DE."

21

126. One of Defendant Lundy's advertisements appearing on the exteriors of SEPTA buses displays a photograph of two individuals, superimposed on which is the text "SOCIAL SECURITY CLIENT."

127. One of Defendant Lundy's advertisements appearing on the exteriors of SEPTA buses displays a photograph of two individuals, superimposed on which is the text "WORKERS COMP CLIENT."

128. None of the above advertisements indicate that Defendant Lundy does not handle workers' compensation and social security disability matters in any of the jurisdictions identified (Pennsylvania, New Jersey, and Delaware), or disclose that Defendant Lundy may refer such cases to other lawyers outside of his firm.

129. Upon information and belief, however, Defendant Lundy does not handle workers' compensation or social security disability matters in some or all of the jurisdictions its advertisements identify.

130. Instead, upon information and belief, Defendant Lundy accepts inquiries from potential clients who view Lundy Law advertising and seek representation in such matters, collects intake information from the callers, and then refers them to other lawyers in other law firms to handle their workers' compensation and social security disability matters in the relevant jurisdictions.

131. The "Practice Areas" section of Defendant Lundy's firm website includes individual pages regarding "Workers' Compensation" and "Social Security Disability."

132. The website, however, does not identify a single social security disability lawyer employed by Defendant Lundy, and the only workers' compensation lawyer it identifies is Lenard A. Cohen, Esquire, who is actually employed by another law firm, and not by the Lundy Law firm as advertised.

22

133. Neither the Pennsylvania Supreme Court Disciplinary Board records for Mr. Cohen nor Mr. Cohen's Martindale-Hubbell entry identify any association between Mr. Cohen and Defendant Lundy Law.  Instead, they both identify Mr. Cohen's law firm as "Lenard A. Cohen, P.C."

134. Defendant Lundy's advertisements fail to disclose to their intended audience that Defendant Lundy itself will not handle some or all workers' compensation and social security disability matters.  This is in violation of Pennsylvania Rule of Professional Conduct 7.2, which provides, in relevant part:

> A lawyer shall not, directly or indirectly, advertise that the lawyer or his or her law firm will only accept, or has a practice limited to, particular types of cases unless the lawyer or his or her law firm handles, as a principal part of his, her or its practice, all aspects of the cases so advertised from intake through trial. If a lawyer or law firm advertises for a particular type of case that the lawyer or law firm ordinarily does not handle from intake through trial, that fact must be disclosed. A lawyer or law firm shall not advertise as a pretext to refer cases obtained from advertising to other lawyers.

Pa. R.C.P. 7.2(k).

135. In effect, by failing to disclose in its advertisements that it does not handle all aspects of workers' compensation and social security disability cases from intake through trial, Defendant Lundy uses its advertisements as a pretext to lure potential clients into its intake process so that it can treat their identities and information as assets to be sold or traded to other lawyers seeking workers' compensation and social security disability business.

136. Such advertisements are false, misleading, unethical, and anticompetitive.

137. Such advertisements also help to monopolize or attempt to monopolize the market for personal injury, social security disability and workers' compensation matters by siphoning off clients that might otherwise retain Plaintiff Pitt Law or another competitor who do, in fact, handle such matters.

**Sham Litigation**

138. Defendant Lundy has also threatened and filed litigation with no good faith basis in law and fact against Pitt Law for anticompetitive purposes. Specifically, in January 2013, Defendant Lundy sent a letter to Pitt Law alleging that Pitt Law's use in advertising of the phrase "REMEMBER THIS NUMBER" infringed on a trademark allegedly owned by Defendant Lundy on the phrase "REMEMBER THIS NAME," and demanding that Pitt Law cease and desist in its use of the phrase "REMEMBER THIS NUMBER."

139. On March 4, 2013, Defendant Lundy filed a baseless lawsuit against Pitt Law in this Court in a case titled *Lundy Law, LLP v. Larry Pitt & Associates*, Case 2:13-cv-01161-JHS (E.D. Pa.) (the "Trademark Lawsuit"), alleging various theories of trademark infringement and unfair competition related to Pitt Law's use in its advertising of the descriptive and instructional phrase "REMEMBER THIS NUMBER" and claiming that Pitt Law's trademark infringement was causing "damage to Lundy Law's reputation and goodwill" such that it would suffer irreparable harm if an injunction was not timely granted. Defendant L. Leonard Lundy authorized the initiation and continuation of that baseless lawsuit against Pitt Law and verified under oath the Complaint filed therein.

140. Plaintiff Pitt Law had used the phrase "REMEMBER THIS NUMBER" in its advertising for almost a year, without any objection from Defendant Lundy, before Defendant Lundy filed the Trademark Lawsuit.

141. Defendant Lundy only began using the phrase "REMEMBER THIS NAME," which is not a registered trademark, in 2011.

142. Defendant Lundy used the phrase only as part of a larger slogan: "INJURED? REMEMBER THIS NAME. 1-800-LUNDY LAW."

24

143. At the time when the Trademark Lawsuit was filed, Defendant Lundy had changed its advertising, and did not even appear to be using the phrase "REMEMBER THIS NAME" in some or all of its advertisements.

144. The two common, ordinary, and generic phrases "REMEMBER THIS NAME" and "REMEMBER THIS NUMBER" are facially distinguishable from one another, unlikely to confuse consumers, and neither phrase, standing alone, identifies the source of the services being offered.

145. Defendant Lundy Law does not have, and never had, any legally protectable rights in the instruction to "REMEMBER THIS NAME."

146. The instruction "REMEMBER THIS NAME" is not inherently distinctive or suggestive and it has never acquired any distinctiveness in the minds of consumers.

147. The instruction "REMEMBER THIS NAME" has no conceptual or commercial strength and no marketplace recognition.

148. Defendant Lundy never presented any basis for its allegation that including in its advertisements an instruction to "REMEMBER THIS NAME" had caused the phrase itself to acquire secondary meaning rendering it protectable under applicable trademark law.  Nor did Defendant Lundy present any evidence of actual confusion on the part of consumers to support its request for preliminary injunctive relief, despite the fact that the two phrases had been used concurrently in advertising for nearly a year before Defendant Lundy decided to file the Trademark Lawsuit.

149. On March 14, 2013, as a result of Defendant Lundy's initiation of the Trademark Lawsuit, an article titled "Pitt & Associates Sued by Lundy Law Over Firm Slogan" appeared in *The Legal Intelligencer*.  The article, which was widely circulated, essentially parroted

25

Defendant Lundy's portrayal of Pitt Law as a trademark infringer.

150. Extensive and costly briefing on Defendant Lundy's motion for preliminary injunction was also undertaken and the Court scheduled a hearing on the motion for the end of June, 2013 after oral depositions were to be taken.

151. On March 22, 2013, the parties served written discovery requests on each other, the responses to which were due by April 25, 2013.

152. On April 18, 2013, Manny Pokitolow, counsel representing Lundy Law, LLP in the Trademark Lawsuit, asked counsel for Pitt Law, Jackie Lesser, whether the fees and costs Pitt Law would incur in defending the Trademark Lawsuit would be paid by Pitt Law itself or by an insurance carrier.  Counsel for Pitt Law responded that insurance coverage was available.

153. That same day, a few hours later, without explanation or any advance notice and after claiming under oath that Pitt Law was causing it "immediate and irreparable injury," Defendant Lundy voluntarily dismissed its Trademark Lawsuit against Pitt Law.  The case has been subsequently marked closed by the Court.

### Anticompetitive Harm

154. Defendant Lundy has used such baseless litigation, as well as long-term exclusive contracts, a media boycott and other wrongful, predatory conduct, to acquire and maintain monopoly power and to attempt to monopolize and unreasonably restrain trade in the market for legal services by small personal injury and social security disability and workers' compensation law firms in the Greater Philadelphia Region, and the upstream market for advertising of such legal services.

155. Through its illegal exclusive dealing agreements, boycott and other wrongful, predatory conduct, Defendant Lundy has substantially foreclosed Pitt Law and others from effectively

26

advertising for legal services in the relevant markets.

156. As a further result of the illegal acts of Defendants, Pitt Law has been severely damaged through lost profits, higher costs and loss of goodwill and name recognition in the relevant markets.

157. Before Defendant Lundy's exclusive deal with SEPA and Titan, Pitt Law placed advertisements on the exteriors of SEPTA buses from approximately 2006 until approximately January 2012. After it was foreclosed from purchasing these advertisements (which, as explained above, are the most effective and efficient forms of advertising), and as a consequence thereof, Pitt Law's net income decreased. Pitt Law's 2012 year-end total net income was approximately 15% lower than its 2011 year-end total net income.

158. Pitt Law's 2012 year-end total fees received in workers' compensation matters were approximately 19.1% lower than its 2011 year-end total fees received in workers' compensation matters. Its 2012 year-end total referral fees for workers' compensation matters were approximately 13.4% lower than its 2011 year-end total referral fees for workers' compensation matters.

159. Pitt Law's total fees received in workers' compensation matters from January through May 2013 was approximately 14.5% lower than its total fees received in workers' compensation matters from January through May 2012. Its total referral fees received in workers' compensation matters from January through May 2013 were approximately 45.3% lower than its total referral fees received in workers' compensation matters from January through May 2012.

160. Before Defendant Lundy Law's exclusive advertising contracts were executed, Pitt Law's net income and fees received in workers' compensation matters typically increased year-over-year. For example, from 2008 to 2009 Pitt Law's net income increased by approximately

EAST\56504017.7

17.6%. Its fees received in workers' compensation matters increased by approximately 5.2%.

161. From 2009 to 2010, Pitt Law's net income increased by approximately 1.1%. Its fees received in workers' compensation matters increased by approximately 3.9%.

162. In 2008, Pitt Law received 142 client referrals based on SEPTA advertisements.

163. In 2009, Pitt Law received 160 client referrals based on SEPTA advertisements.

164. In 2010, Pitt Law received 197 client referrals based on SEPTA advertisements.

165. In 2011, Pitt Law received 146 client referrals based on SEPTA advertisements.

166. In 2012, after Defendant Lundy's exclusive deal with SEPTA began, Pitt Law received only 16 client referrals based on SEPTA advertisements.

167. From January 1, 2013 through July 23, 2013, Pitt Law had received only 12 client referrals based on SEPTA advertisements.

168. The decrease in Plaintiff Pitt Law's net income, yearly fees, and SEPTA-based referrals correlates directly with Defendant Lundy's execution of the exclusive advertising contracts.

169. Defendants have also caused harm to competition among small personal injury, social security disability and workers' compensation law firms in the Greater Philadelphia Region.

170. Leonard K. Hill was foreclosed from placing advertisements on the exteriors of SEPTA buses, because Defendant Lundy executed its exclusive deal with Titan and SEPTA before Leonard K. Hill even had a chance to attempt to purchase such advertisements.

171. Rand Spear previously placed advertisements for his law firm on the exteriors of SEPTA buses for six years, and clients frequently stated that they learned about Mr. Spear's name and services from seeing his advertisements on the exteriors of buses.

172. As a result of being foreclosed from advertising on the exteriors of buses, Mr. Spear has also lost prospective clients.

173. The relevant markets are, and at all relevant times have been, highly concentrated. Defendant Lundy dominates these markets. There are no viable alternatives for the mass reach, constant messaging, saturation advertising for which Defendant Lundy has secured exclusive deals.

174. Defendant Lundy's predatory and anticompetitive conduct also harms consumers. By obtaining exclusive control of the most effective and efficient forms of advertising for small personal injury and social security disability and workers' compensation law firms, Defendant Lundy has established a stranglehold on the primary source of clients for such firms. In so doing, Defendant Lundy has limited consumer choice and seized the ability to increase the cost of legal services to clients.

175. Small personal injury, social security disability and workers' compensation law firms generally work under contingent fee agreements whereby the fee paid to the law firm is equal to a percentage of any recovery the law firm obtains for the client.

176. Traditionally, the percentage such law firms charge is 33 1/3%, but this percentage is not prescribed or restricted by any governing authority. The only constraint on contingent fees is a reasonableness standard imposed by the Pennsylvania Rules of Professional Conduct.

177. If Defendant Lundy is permitted to maintain control over the primary source of clients for small personal injury and social security disability and workers' compensation law firms, it will have free reign to increase its contingent fees, thereby artificially increasing the price of legal services in the relevant markets to customers.

## COUNT ONE

### SHERMAN ANTITRUST ACT SECTION 2 – UNLAWFUL MONOPOLIZATION (15 U.S.C. § 2)

178. Plaintiff Pitt re-alleges and incorporates as though fully set forth herein the allegations

29

contained in paragraphs 1 through 177 of this Amended Complaint.

179. Defendant Lundy's admitted monopoly position in the advertising of legal services for small personal injury and social security disability and workers' compensation law firms in the relevant geographic market has been acquired and maintained through exclusionary, predatory and other unjustified illegal and unethical business conduct, as opposed to a superior product, business acumen, or historic accident.

180. As a direct and proximate result of Defendant Lundy's unlawful conduct as described above, Pitt Law and other similarly situated firms have been injured and continues to be injured in its business and property in an amount to be proven at trial.

181. Defendant Lundy's unlawful activity has directly injured and continues to injure Pitt Law and others by harming Pitt Law and others as a competitor, and by obstructing and impeding Pitt Law's and other's ability to offer competing services in essential media outlets in the relevant market that has been affected by Defendant Lundy's unlawful conduct, thereby diminishing Pitt Law's profits and value as an enterprise.

182. Defendant Lundy's anticompetitive and exclusionary conduct has injured competition and deprived consumers of information about competing law firms, including Pitt Law and others. The anticompetitive effects of Defendant Lundy's conduct far outweigh any pro-competitive justification and are only anticompetitive in intent and effect.

## COUNT TWO

## SHERMAN ANTITRUST ACT SECTION 2 – ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2)

183. Plaintiff Pitt Law re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 182 of this Amended Complaint.

184. Defendant Lundy has acquired and sold the relevant product and/or services in interstate

30

commerce and has engaged in the exclusionary and predatory conduct described herein through interstate channels in an attempt to monopolize the relevant markets described herein.

185. Defendant Lundy's exclusionary and predatory conduct, as described above, has been undertaken with the specific intent to create a monopoly in each of the relevant markets.

186. As a direct and proximate result of Defendant Lundy's unlawful conduct, Pitt Law and others have been injured in its business and property in an amount to be proven at trial.

187. Defendant Lundy's unlawful activity has directly injured Pitt Law and others by harming Pitt Law and others as a competitor, and by obstructing and impeding Pitt Law's ability to offer competing services in essential media outlets in the relevant market that has been affected by Defendant's unlawful conduct, thereby diminishing Pitt Law's and other's profits and value as viable enterprises.

188. Defendant Lundy's anticompetitive and exclusionary conduct has injured competition and deprived consumers of information about competing law firms, including Pitt Law and others.  The anticompetitive effects of Defendant Lundy's conduct far outweigh any pro-competitive justification and are only anticompetitive in intent and effect.


## COUNT THREE

## SHERMAN ANTITRUST ACT SECTION 1 – UNLAWFUL BOYCOTT
## (15 U.S.C. § 1)

189. Plaintiff Pitt Law re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 188 of this Amended Complaint.

190. Defendant Lundy has an admitted dominant position in the advertising of legal services by small personal injury, social security disability and workers' compensation law firms in the Greater Philadelphia Region.

191. Defendants Lundy Law, LLP and L. Leonard Lundy's boycott with others, as described above, has been undertaken with the purpose and intent of excluding Pitt Law and others from the advertising of legal services in essential media outlets.

192. As a direct and proximate result of Defendants Lundy Law, LLP and L. Leonard Lundy's unlawful boycott, Pitt Law and others have been injured in its business and property in an amount to be proven at trial.  Defendants Lundy Law LLP's and L. Leonard Lundy's unlawful boycott has directly injured Pitt Law and others by harming Pitt Law and others as a competitor and by obstructing Pitt Law's ability to offer competing services in essential media outlets in the relevant markets that have been affected by the boycott, thereby diminishing Pitt Law's and other's profits and value as an enterprise.

193. Defendant Lundy's anticompetitive and exclusionary conduct has injured competition and deprived consumers of information about competing law firms, including Pitt Law and others.  The anticompetitive effects of Defendant Lundy's conduct far outweigh any pro-competitive justification.

## COUNT FOUR

### SHERMAN ANTITRUST ACT SECTION 1 – UNLAWFUL EXCLUSIVE DEALING (15 U.S.C. § 1)

194. Plaintiff Pitt Law re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 193 of this Amended Complaint.

32

195. Defendant Lundy's exclusive agreements in conspiracy with retailers and others have been for the provision of goods and services or other commodities (including advertising) for use, consumption, or resale within the United States.

196. The effect of each of Defendant Lundy's conspiratorial exclusive agreements with various media outlets and the effect of them in the aggregate is to substantially lessen competition in the relevant market.

197. As a direct and proximate result of Defendant Lundy Law, LLP's and Defendant L. Leonard Lundy's unlawful conduct, Pitt Law and others have been injured in their business and property in an amount to be proven at trial.

198. Defendants' unlawful activities have directly injured Pitt Law and others by harming Pitt Law and others as a competitor and by obstructing Pitt Law's and other's ability to offer competing services in media outlets in the relevant market that has been affected by Defendant's unlawful conduct, thereby diminishing Pitt Law's and other's profits and value as an enterprise.

199. Defendant Lundy's anticompetitive and exclusionary conduct has injured competition and deprived consumers of information about competing law firms, including Pitt Law and others. The anticompetitive effects of Defendant Lundy's conduct far outweigh any pro-competitive justification.

## COUNT FIVE

### VIOLATION OF THE LANHAM ACT
### (15 U.S.C. § 1051 *ET SEQ.*)

200. Plaintiff Pitt Law re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 199 of this Amended Complaint.

EAST\56504017.7

201. Defendant Lundy Law has made false or misleading statements in advertisements regarding the legal services it provides, including, but not limited to, representing to consumers that it handles workers' compensation and social security and disability matters when it does not handle such matters itself.

202. Defendant Lundy's statements actually deceive or at least have a tendency to deceive a substantial portion of their intended audience.

203. The deception is material in that it is likely to influence the decisions of potential clients to engage Defendant Lundy rather than engaging another competing law firm, like Pitt Law and other similar firms.

204. The legal services Defendant Lundy advertises affect interstate commerce because the advertisements run in Pennsylvania, New Jersey, and Delaware, and Defendant Lundy Law, LLP, a Pennsylvania limited liability partnership, actively seeks out potential clients in all three states.

205. Defendant Lundy's false statements have injured, and are likely to continue to injure, Pitt Law and others by causing a decline in revenue, loss of good will, and other harm in an amount to be determined at trial, including, as an alternative, the disgorgement of profits illegally obtained by Defendant Lundy as a result of its false and misleading statements.

<u>**COUNT SIX**</u>

**PENNSYLVANIA COMMON LAW – UNFAIR COMPETITION**

206. Plaintiff Pitt Law re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 205 of this Amended Complaint.

207. Defendants Lundy Law, LLP and L. Leonard Lundy have, as described above, engaged in conduct, which is contrary to honest industrial and commercial practice, and thus, has engaged

34

in unfair competition, in violation of the common law of the Commonwealth of Pennsylvania.

208. Defendant Lundy's acts are calculated to procure an unfair competitive advantage by misappropriating the commercial advantage of Plaintiff Pitt Law through Defendant Lundy's exclusive contracts, false and misleading advertising, filing baseless litigation and other predatory and unfair conduct described herein.

209. Defendants Lundy Law, LLP and L. Leonard Lundy have engaged in the aforementioned acts willfully and deliberately and their conduct has caused injury to Plaintiff Pitt Law as well as to other similar law firms and the public.

210. As a result thereof, Plaintiff Pitt Law has been directly injured in an amount to be determined at trial, including, as an alternative, the disgorgement of profits illegally obtained by Defendant Lundy as a result of its unfair competitive conduct.

211. Defendant Lundy's anticompetitive and predatory conduct has injured competition and deprived consumers of information about competing law firms, including Pitt Law and others. The anticompetitive effects of Defendant Lundy's conduct far outweigh any pro-competitive justification.

## COUNT SEVEN

### PENNSYLVANIA COMMON LAW – TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACT

212. Plaintiff Pitt Law re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 211 of this Amended Complaint.

213. Defendants Lundy Law, LLP and L. Leonard Lundy, through their exclusive and restrictive advertising contracts and other anticompetitive conduct, tortuously interfered with Pitt Law's prospective contracts with SEPTA, BARTA, KYW Newsradio and the Wells Fargo Center.

35

214. Plaintiff Pitt Law historically contracted with these media outlets and had a realistic anticipation of being able to renew those contracts, which was more than a mere hope.

215. Defendants Lundy Law, LLP and L. Leonard Lundy entered into exclusive and restrictive advertising contracts with these media outlets with the purpose and intent of harming Plaintiff Pitt Law.

216. There is no privilege or justification for Defendant Lundy's actions.

## COUNT EIGHT

### VIOLATION OF PENNSYLVANIA'S DRAGONETTI ACT
### (42 Pa. C.S.A. § 8351)

217. Plaintiff Pitt Law re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 216 of this Amended Complaint.

218. Defendant Lundy engaged in wrongful use of civil proceedings by improperly employing baseless litigation as a competitive weapon against Pitt Law.  The Trademark Lawsuit had no legitimate purpose and was brought primarily, if not solely, to cause Pitt Law financial and competitive harm, not to obtain an adjudication of the parties' respective rights.

219. Defendant Lundy procured, initiated, and continued the Trademark Lawsuit by threatening the action, filing the complaint, moving for a preliminary injunction, engaging in costly briefing, and serving written discovery, all at great expense to Pitt Law.

220. Defendant Lundy, through its counsel, initiated the Trademark Lawsuit in a grossly negligent manner and/or without probable cause.

221. Had Defendant Lundy and its counsel cursorily reviewed the facts and the applicable law, they would have known that marks of the type for which Defendant Lundy claimed protection in the Trademark Lawsuit are generic and descriptive and, therefore, not entitled to the protection of the trademark laws.

36

222. Defendant Lundy could not reasonably have believed that, under the facts alleged, their claim could be valid under existing or developing law, and Defendant Lundy either did not seek in good faith the advice of counsel regarding the purported claims or did not disclose all relevant facts to counsel.

223. Defendant Lundy's counsel could not have believed in good faith that initiation and/or continuation of the Trademark Lawsuit was not intended merely to harass or maliciously injure Pitt Law.  Defendant Lundy's improper purpose in bringing and continuing the Trademark Lawsuit is demonstrated by Defendant Lundy's abrupt dismissal of the case, on its own initiative, after its counsel found out from Pitt Law's counsel that Pitt Law's legal fees and costs would be paid by an insurance carrier and not by Pitt Law itself.

224. Defendant Lundy brought the Trademark Lawsuit primarily for purposes other than that of securing the proper discovery, joinder of parties, or adjudication of the claim in which the proceedings were based.

225. Those purposes included, but were not limited to: (1) forcing Pitt Law to waste its own funds on a defense, (2) shutting down Pitt Law's advertising, (3) intimidating Pitt Law into changing its firm slogan, and (4) disparaging Pitt Law on the public record.

226. The Trademark Lawsuit was terminated in Pitt Law's favor when Defendant Lundy voluntarily and unilaterally dismissed the case in its entirety on April 18, 2013.

## COUNT NINE

### PENNSYLVANIA COMMON LAW – ABUSE OF PROCESS

227. Plaintiff Pitt Law re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 226 of this Amended Complaint.

EAST\56504017.7

228. As set forth above, Defendant Lundy filed the Trademark Lawsuit for reasons that were wholly unrelated to the enforcement of any trademark rights.

229. Defendant Lundy's conduct constituted a perversion of legal process and a use of the process primarily to accomplish a purpose for which it was not designed.

230. Defendant Lundy used the Trademark Lawsuit as a tactical weapon, to drain Pitt Law's resources and to harass, coerce, and intimidate Pitt Law into changing, curtailing, or eliminating its advertising so that it could no longer compete as effectively with Lundy Law, LLP, all of which was intended to cause, and did cause, financial and competitive harm to Pitt Law.

231. By pursuing the Trademark Lawsuit, Defendant Lundy wrongfully used the legal process to force Pitt Law to expend its own funds for the defense of baseless claims, thereby draining its resources and causing it competitive harm. As soon as Defendant Lundy found out that an insurance carrier would pay Pitt Law's legal fees and costs, Defendant Lundy unilaterally withdrew the Trademark Lawsuit.

232. Defendant Lundy also wrongfully used the legal process as a means of creating an unfavorable public portrayal of Pitt Law, *i.e.*, by placing on the public record unfounded accusations that were repeated in news outlets, resulting in further competitive harm to Pitt Law and simultaneously serving as a form of free advertising for Defendant Lundy Law, LLP.

38

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Pitt Law respectfully prays that:

233. This Court enter judgment that:

    a.    Defendants have violated the Sherman Antitrust Act §§ 1 and 2;

    b.    Defendants have violated the Lanham Act, 15 U.S.C. § 1051 *et seq.*;

    c.    Defendants have engaged in unfair competition at common law;

    d.    Defendants have engaged in tortious interference with prospective contract;

    e.    Defendants have violated Pennsylvania's Dragonetti Act (42 Pa. C.S.A. § 8351); and

    f.    Defendants have engaged in common law abuse of process.

234. This Court award monetary damages sustained by Plaintiff Pitt Law from Defendants, jointly and severally, as a result of injury due to Defendants' violations of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2) in amounts to be ascertained at trial, such amounts to be trebled pursuant to Section 4 of the Clayton Act, (15 U.S.C. § 15).

235. Defendants be required, in the alternative, to account for and pay to Plaintiff Pitt Law all profits realized by Defendants as a result of the illegal acts complained of herein, pursuant to Pennsylvania common law, pursuant to the Lanham Act and state law.

236. This Court award to Plaintiff Pitt Law recovery of the costs of this suit, including its reasonable attorneys' fees and costs incurred herein and in connection with the prior baseless lawsuit filed by Defendant Lundy against it, referenced herein.

237. This Court award punitive and exemplary damages to Plaintiff Pitt Law based on Defendants' conduct.

EAST\56504017.7

238. This Court enter an injunction and related consent decree enjoining Defendants' illegal conduct.

239. This Court award such other, different and further relief as the Court may deem just, equitable and proper.

**DLA Piper LLP (US)**

By: _____

Carl W. Hittinger (Bar No. 30250)
Lesli C. Esposito (Bar No. 201916)
Robert E. Connolly (Bar No. 32341)
Adam D. Brown (Bar No. 205899)
DLA Piper LLP (US)
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA
T: 215-656-2449
F: 215-606-2149
carl.hittinger@dlapiper.com
lesli.esposito@dlapiper.com

Date:  August 12, 2013

*Attorneys for Plaintiff*
*Larry Pitt & Associates*

41

## <u>VERIFICATION</u>

I, Larry Pitt, am authorized to make this Verification on behalf of Plaintiff Larry Pitt & Associates. I declare under penalty of perjury that the facts set forth in the foregoing First Amended Verified Complaint are true and correct to the best of my personal knowledge and information. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: 8/12/13

_____
Larry Pitt

EAST\56504017.7

## CERTIFICATE OF SERVICE

I, Carl W. Hittinger, hereby certify that on August 12, 2013, I caused the foregoing First

Amended Verified Complaint to be served via express Mail and electronic mail upon the

following:

> Robert C. Heim, Esquire
> Carolyn M. Hazard, Esquire
> Brian P. Savage, Esquire
> Dechert LLP
> Cira Centre
> 2929 Arch Street
> Philadelphia, PA 19104-2808

*Attorneys for Defendants Lundy Law, LLP and Leonard L. Lundy*

Carl W. Hittinger