IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LARRY PITT & ASSOCIATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 13-2398 |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| LUNDY LAW, LLP, L. LEONARD | ) | |
| LUNDY, and TITAN OUTDOOR LLC | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED VERIFIED COMPLAINT

Carl W. Hittinger (Bar No. 30250)
Lesli C. Esposito (Bar No. 201916)
Robert E. Connolly (Bar No. 32341)
Adam D. Brown (Bar No. 205899)
DLA Piper LLP (US)
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA
T: 215-656-2449
F: 215-606-2149
carl.hittinger@dlapiper.com
lesli.esposito@dlapiper.com

Date: January 2, 2014

*Attorneys for Plaintiff*
*Larry Pitt & Associates*

**TABLE OF CONTENTS**

**Page**

I. SUMMARY OF THE CASE ................................................................. 2

II. JURISDICTION AND VENUE ......................................................... 7

III. THE PARTIES ................................................................................ 7

IV. INTERSTATE COMMERCE .......................................................... 8

V. THE RELEVANT MARKET ........................................................... 9

VI. FACTS GIVING RISE TO THESE CLAIMS ................................. 10

A.  Pitt and Lundy and Their Businesses ................................. 10

B.  Legal Advertising in the Relevant Legal Services Market ................................. 11

C.  The Necessity of Bus-Exterior Advertisements to Effective and Cost-Efficient Competition in the Relevant Legal Services Market ........................... 13

D.  The Limited Effectiveness and Efficiency of Other Forms of Advertising as Compared to Bus-Exterior Advertising ........................................... 17

E.  The Most Effective and Efficient Use of Other Mass Reach, Constant Messaging Saturation Advertising as Supplements to Bus-Exterior Advertising ................................................. 21

F.  Lundy's False and Predatory Advertising ........................................... 23

G.  Lundy's Exclusive Perpetually Renewable Advertising Contracts ................... 26

    1. Lundy's Exclusive Perpetually Renewable Deal with Titan and SEPTA ....... 29

        a.  Lundy's Conspiracy With Law Firm Advertiser Partners to Preclude Competitors From Advertising on SEPTA ................. 33

        b.  The Indispensable Role of L. Leonard Lundy's Daughter, Sara Lundy, in Enabling Lundy and Its Co-Conspirators to Secure and Maintain Exclusive Rights with SEPTA and NJ Transit. ................................................. 36

        c.  Titan's Destruction of E-mails and Other Key Documents Relevant to Lundy's Exclusive Deal with Titan and SEPTA ...... 38

        d.  Attempts of Competitors to Advertise on the Exteriors of SEPTA Buses That Have Been Thwarted Due to Lundy's Exclusive Deal ................................................. 41

    2. Lundy's Other Exclusive Advertising Deals With Other Transit Agencies ................................................. 45

    3. Lundy's Other Exclusive Advertising Deals ................................. 46

H.  The Anticompetitive Effects of Lundy's Exclusive Advertising Contracts and False Advertising ................................................. 48

# TABLE OF CONTENTS
(continued)

**Page**

I.      Lundy's Other Predatory Conduct ...................................................................... 50

        1. Sara Lundy's Role in Enabling Lundy's Anticompetitive Practices .............. 51

        2. Titan's Sharing of Competitive Information with Lundy ................................ 51

        3. Lundy's Predatory Sham Litigation ............................................................... 52

        4.  Lundy's Predatory Scheme of Unethical and Illegal Referral Cash
            Payments by Doctors ................................................................................ 55

J.      Anticompetitive Harm Caused by Lundy's Exclusive Advertising
        Contracts and Other Predatory Conduct ......................................................... 57

        1. Harm Caused to Pitt by Lundy's Predatory Conduct ..................................... 57

        2. Harm Caused to Competition by Lundy's Predatory Conduct ....................... 59

        3. Harm Caused to Consumers by Lundy's Predatory Conduct ......................... 60

COUNT ONE - SHERMAN ANTITRUST ACT SECTION 2 – UNLAWFUL
        MONOPOLIZATION ....................................................................................... 61

COUNT TWO - SHERMAN ANTITRUST ACT SECTION 2 – CONSPIRACY TO
        MONOPOLIZE ................................................................................................ 63

COUNT THREE - SHERMAN ANTITRUST ACT SECTION 2 – ATTEMPTED
        MONOPOLIZATION ....................................................................................... 65

COUNT FOUR - SHERMAN ANTITRUST ACT SECTION 1 – UNLAWFUL
        EXCLUSIVE DEALING ................................................................................. 67

COUNT FIVE - VIOLATION OF THE LANHAM ACT ......................................... 70

COUNT SIX - PENNSYLVANIA COMMON LAW – UNFAIR COMPETITION ................. 71

COUNT SEVEN - PENNSYLVANIA COMMON LAW – TORTIOUS
        INTERFERENCE WITH PROSPECTIVE CONTRACT ............................. 74

COUNT EIGHT - VIOLATION OF PENNSYLVANIA'S DRAGONETTI ACT .................. 76

Plaintiff Larry Pitt & Associates ("Pitt"), by and through its undersigned attorneys, brings the following claims against Defendants Lundy Law, LLP and L. Leonard Lundy (collectively "Lundy"), and Defendant Titan Outdoor LLC ("Titan").

1. This is an action for violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2; the Lanham Act, 15 U.S.C. § 1051 *et seq.*; unfair competition under Pennsylvania common law; tortious interference with prospective economic advantage; and Pennsylvania's Dragonetti Act, 42 Pa. C.S.A. § 8351.

2. This action seeks actual, trebled and punitive damages, as well as injunctive relief and disgorgement of Lundy's illegally obtained profits, and illegal referral payments from lawyers and doctors.

3. As set forth below, Lundy has acted both unilaterally and in concert with others to monopolize, attempt to monopolize, and conspire to monopolize the relevant legal services market through a series of overt predatory acts including: (1) entering into long term exclusive advertising contracts that are de facto perpetually renewable at Lundy's sole discretion with multiple transit agencies, including transit agencies represented by Titan, to advertise on the exteriors of buses throughout the Greater Philadelphia Region; (2) entering into other anticompetitive, long term exclusive advertising contracts that are de facto perpetually renewable at Lundy's sole discretion with other premium advertising outlets; (3) falsely advertising the legal services Lundy provides, and referring misled clients to its partner conspiring law firms; (4) partnering with other law firms, which, in turn, help pay for Lundy's exclusive contracts through referral fees and payments for advertisements run by Lundy promoting the legal services those other law firms engage in that Lundy does not engage in; and (5) filing sham litigation when Pitt attempted to compete with Lundy with advertising of its own. Lundy has obtained and

maintained its dominant position through the above acts that are paid for, in part, by charging clients supra-competitive fees and also by demanding from numerous doctors, illegal and unethical cash referral fees for clients.  Doctors pay these fees because of Lundy's dominant position in the legal services market, as defined herein.  These predatory acts cumulatively constitute violations of Sections One and Two of the Sherman Act as well as other violations of the Lanham Act and state law as described herein.

## I. <u>SUMMARY OF THE CASE</u>

4. Lundy's predatory conduct has included entering into exclusive contracts that are de facto perpetually renewable at Lundy's sole discretion for essential legal advertising with media outlets and others, which has substantially foreclosed Pitt and other competitors from obtaining necessary advertisement of legal services in the highly coveted mass reach media outlets in the Greater Philadelphia Region, as defined herein.  This complete foreclosure of essential advertising opportunities has resulted in decreased revenues and related injury to Pitt and competing law firms.

5. This predatory conduct has also included Lundy making false and misleading statements in its advertisements to illegally steer clients away from its competitors, and filing sham intellectual property claims in this Court, including a frivolous request for injunctive relief against Pitt.  The objectively baseless nature of those claims and the underlying intent to threaten and intimidate other law firms who attempt to compete against Lundy, was affirmed when Lundy inexplicably withdrew the claims, but only after Pitt had incurred substantial expense in defense thereof, and only after the resulting widespread negative publicity for Pitt about the litigation.

6. Lundy has also demanded and extracted significant cash payments from doctors in exchange for Lundy referring its clients or prospective clients to those doctors for medical care

and treatment.  Such payments are prohibited by 18 Pa.C.S.A. § 4117(b)(2)(3) (insurance fraud).
Lundy's dominant market power in the relevant legal services market has enabled him to demand
and receive these payments because client patient referrals from Lundy are critical to the
continued businesses of these doctors.  In turn, these cash payments have enabled Lundy to
finance his false advertising scheme to the detriment of Pitt and other competitors.

7. Lundy has conspired with Defendant Titan to unreasonably restrain trade and substantially
lessen competition in the legal services market for personal injury and social security disability
and workers' compensation law in the Greater Philadelphia Region, as defined herein.

8. Moreover, Lundy's advertisements falsely state that Lundy handles matters it does not
actually handle, such as social security disability and workers' compensation claims.  Once a
prospective client has been lured into Lundy's intake process by these widespread false
advertisements, Lundy refers the prospective and unknowing client to a co-conspirator law firm
that actually handles matters in the practice areas Lundy falsely advertises as its own, thereby
depriving Pitt and other competitors from the ability to obtain such clients.

9. Lundy's conspiracy with other competing law firms has helped pay for Lundy's exclusive
contracts and, in return, Lundy falsely advertises that it performs services related to social
security disability and workers' compensation claims, areas in which its advertising partners
actually practice.  Lundy then refers clients seeking such services to its conspiring advertising
partners in exchange for a referral fee, which is used to subsidize such false advertising.

10. The concerted intent of Defendants and others in seeking to funnel all prospective clients
into Lundy's intake process is not to compete on the merits, but rather, to reduce or eliminate
competition in the relevant market for legal services by diverting business to a single law firm,

Lundy Law, LLP, so that Lundy serves as the de facto clearinghouse for nearly all inquiries made by prospective clients in the relevant market for legal services, as defined herein.

11. Lundy's anticompetitive advertising scheme, which it perpetrates and funds in concert and in combination with other co-conspirators, and in cooperation with advertising agents, sellers and providers such as Defendant Titan, has the following components:

    a.  Lundy secures exclusive, de facto perpetually renewable advertising agreements at the same price each year, giving Lundy the sole right to place advertisements on the exteriors of buses operated by mass transit organizations such as SEPTA, Berks Area Regional Transportation Authority ("BARTA"), Delaware Area Rapid Transit ("DART"), New Jersey Transit ("NJ Transit"), and other essential outlets and media, and the exclusive contract with SEPTA/Titan also prohibits competitors from obtaining the exclusive right to advertise on the interior of buses as well as subway cars and transit stations.

    b.  Lundy places advertisements falsely stating that Lundy handles certain types of matters, such as social security disability and worker's compensation matters, and omitting the fact that Lundy will refer all such matters to its co-conspirators.

    c.  Lundy's competing law firm advertising partners agree to help fund Lundy's false advertisements, and then accept referrals of certain types of prospective clients from Lundy, such as those seeking social security disability and worker's compensation legal services.

    d.  Lundy, with no intention of ever handling social security disability and workers' compensation matters, nevertheless accepts prospective clients into its intake process on false premises, and then refers such cases to its advertising partners.

4

e. Lundy accepts fees and/or other payments from its advertising partners which it then spends on further exclusive, false, and predatory advertising directed at preventing consumers from obtaining information about competing law firms, and precluding competing law firms, like Pitt, from obtaining the brand name recognition that is necessary for them to compete effectively.

f. By combining and conspiring with other competing law firm partners, Lundy has extended and seeks to continue to extend its dominant position in the relevant market for legal services.

g. Finally, Lundy demands and obtains illegal and unethical cash payments from doctors in order for them to obtain referrals of Lundy's clients, or clients Lundy has referred to other partnering law firms, which additional influx of substantial cash further facilitates, in part, Lundy's ability to pay premium prices for advertising to the further detriment of its competitors who will not engage in such illegal and unethical payments.

12. The effect of Lundy's predatory scheme is to preclude competition in the relevant market for legal services as defined herein, giving Lundy the ability to control the vast majority of client referrals and divert them to a co-conspirator law firm of its choice, thereby setting up insurmountable barriers to entry for any competitors or would-be competitors that are not part of the scheme. In doing so, Lundy has raised his rivals' costs by locking up exclusive contracts in perpetuity with the most efficient advertising outlets, thereby requiring rivals to use expensive forms of advertising that do not achieve the same efficiencies and effectiveness. Lundy has also achieved unlawful cost savings by conspiring with advertising partners to fund its exclusive

contracts, false advertising and sham litigation. Pitt and other competitors in this market cannot match these cost savings since they are not engaging in similar illegal and unethical conduct.

13. Lundy's predatory conduct has, and will continue to, prevent competitors from entering the market or from maintaining or growing their shares of the market for legal services for workers compensation, social security and small personal injury cases.

14. Lundy's predatory scheme also gives him the ability to charge excessive supra-competitive contingency fees for its legal services for small personal injury work, because consumer clients are left with a significantly diminished choice of law firms to contact and retain for the legal services Lundy advertises.

15. As a result of its predatory advertising scheme and other *Conwood*[1] type predatory conduct, Lundy is able to charge as high as 45% of any small personal injury recovery obtained on behalf of a client. The typical contingent fee charged for small personal injury cases in the Greater Philadelphia Region is 33% to 40% of any recovery and sometimes less.

16. As discussed above, Lundy has also engaged in other predatory conduct directed at reducing competition on the merits, including a continuing and pervasive practice whereby he, and others acting on his behalf, demand and obtain payments in cash from doctors in exchange for Lundy referring clients to those doctors. These cash referral payments from doctors have been taking place at the Lundy firm since at least 2006. After Leonard Lundy took over the firm in December 2011, upon the death of his uncle Marvin Lundy, the illegal and unethical payment scheme continued except the cash referral payments from doctors went from $200 to $800, or more.

17. These illegal and unethical cash payments provide Lundy, unlike Pitt and other competitors, with supra-competitive profits and an unfair funding source to finance his costly

---

[1] *See Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002).

premium exclusive advertising. The ability to extract such substantial cash payments from doctors is also further evidence of Lundy's dominant market power in the market for legal services, as defined herein.

## II. JURISDICTION AND VENUE

18. The amount in controversy exclusive of interest and costs exceeds the sum or value of $75,000.

19. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, in that the claims arise under the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2 and the Lanham Act, 15 U.S.C. § 1051, *et seq*. This Court has pendent jurisdiction over the state law claims that arise under the laws of Pennsylvania, pursuant to the principles of supplemental jurisdiction set forth in 28 U.S.C. § 1367.

20. Venue is proper in this district under 28 U.S.C. § 1391(b), as all Defendants reside in this district and events or omissions giving rise to these claims occurred in this district.

21. This Court has personal jurisdiction over Defendant L. Leonard Lundy, as he is located in and conducts business in this district.

## III. THE PARTIES

22. Plaintiff Larry Pitt & Associates is a Pennsylvania professional corporation having its principal place of business at 1918 Pine Street, Philadelphia, Pennsylvania.

23. Defendant Lundy Law, LLP is a Pennsylvania limited liability partnership having its principal place of business at 1635 Market Street, 19th Floor, Philadelphia, Pennsylvania. Lundy Law has seven office locations throughout Pennsylvania, New Jersey and Delaware. Its website says that it employs twelve lawyers. However, these figures understate Lundy Law, LLP's market dominance because it falsely advertises for work it does not perform, and it collects fees

7

from partner law firms with multiple offices for referring these improperly obtained clients. The extent of Lundy Law's revenues and illegally obtained profits, and cash payments from doctors, all subject to disgorgement, are not fully known at this time because that information is solely in the hands of Lundy.

24. Defendant L. Leonard Lundy is a principal with Lundy Law, LLP, and its Managing Partner, and resides in this district.

25. Defendant Titan Outdoor LLC is a New York limited liability company having its principal place of business at 100 Park Avenue, Suite 610, New York, NY. Titan also has an office in this district at 121 S. Broad Street, 17th Floor, Philadelphia, PA.

## IV. INTERSTATE COMMERCE

26. Lundy maintains offices in Pennsylvania, New Jersey, and Delaware.

27. Lundy runs advertisements that appear in Pennsylvania, New Jersey, and Delaware media outlets.

28. Through advertisements, referral sources, and other means, Lundy actively solicits potential clients, secures business, and collects fees from out-of-state, *i.e.*, from clients who reside in New Jersey and Delaware.

29. Lundy collects referral fees and illegal cash referral payments from out-of-state doctors and from out-of-state lawyers.

30. The types of legal services that Lundy provides involve corporations, insurance companies and defense counsel with offices throughout the country, and national federal aid programs such as Medicare and Medicaid.

31. The business activities of Lundy that are the subject of this Second Verified Amended Complaint substantially affect interstate commerce and use communications in interstate

commerce, including the U.S. mail.

32. Titan maintains offices in Pennsylvania, including in Philadelphia.

33. Titan exclusively manages advertising for its nationwide clients, including for SEPTA in Pennsylvania and in New Jersey for NJ Transit.

## V.  THE RELEVANT MARKET

34. For purposes of each of Pitt's antitrust claims herein, the relevant line of commerce in which to assess the anticompetitive effects of Lundy's wrongful conduct is the market for legal services provided by small personal injury and social security disability and workers' compensation law firms in the Greater Philadelphia Region, as defined herein.

35. Upon information and belief, the prices charged for legal services provided by law firms for small personal injury and social security disability and workers' compensation legal services are not constrained by other types of law firms.

36. Consumers primarily base their decision for legal representation for small personal injury and social security disability and workers' compensation legal services on brand name recognition and/or recall.  Lundy's own ads using the phrase, "REMEMBER THIS NAME," further confirms such consumer decision-making.

37. Lundy has admitted that Pitt and Defendant Lundy Law, LLP compete for the same advertising "in connection with services customary in the legal services [market] including, and specifically the identical area of personal injury legal services advertised for and offered by . . . Lundy Law."

38. The relevant geographic market in which to assess the anticompetitive effects of Lundy's wrongful conduct in both relevant lines of commerce is southern New Jersey and Delaware and in Pennsylvania, Berks, Bucks, Delaware, Chester, Montgomery and Philadelphia Counties

("Greater Philadelphia Region").

## VI.  FACTS GIVING RISE TO THESE CLAIMS

### A.  Pitt and Lundy and Their Businesses

39. Pitt is a Pennsylvania-based law firm concentrating in small personal injury and social security disability and workers' compensation law, providing legal representation in the Greater Philadelphia Region.

40. Lundy is a Pennsylvania-based law firm concentrating in small personal injury law, and claiming to also concentrate in social security disability and workers' compensation law, providing legal representation in the Greater Philadelphia Region.

41.  The business of a law firm such as Pitt or Lundy is wholly dependent on the ability of the firm to attract, and ultimately sign engagement agreements with, a high volume of individual clients.  Because each individual client with legal needs such as those served by a small personal injury and social security disability and workers' compensation law firm typically pays the law firm a fixed statutory fee or a contingent fee, *i.e.*, a percentage of whatever amount is recovered for the client, the individual fees collected are often relatively small per case and sporadically collected.  Therefore, law firms in the relevant legal services market typically build their revenue by aggregating such clients in high volume.

42. By dealing in volume, law firms such as Pitt and Lundy are able to ensure a steady cash flow and achieve economies of scale to support their operations while simultaneously striving to grow their practices through increased spending on the most effective and efficient marketing directed at increasing client intake.

43. Another way for law firms such as Pitt and Lundy to improve and increase cash flow is by referring clients to other competing law firms in exchange for a referral fee, which can be

10

used in furtherance of their marketing efforts and other operating expenses if legally obtained.

44. Thus, drawing clients into a given small personal injury and social security disability and workers' compensation law firm's intake process is, in effect, the most important component of such a law firm's business.  Put simply, such a firm must get as many clients in the door, and signed to retention agreements as is reasonably practicable given attorney time and resources, and subject to the ability of the firm's attorneys and staff to handle a maximum number of simultaneous matters competently and effectively.

45. Clients of small personal injury and social security disability and workers' compensation law firms typically experience an *ad hoc* need for such legal services, and continued brand name recognition is the principal factor in consumer choice of legal service providers in this market.

46. If a prospective client is not exposed, through the most effective mass reach advertising, to the name and contact information of a given small personal injury and social security disability and workers' compensation law firm on a routine, consistent, and repetitive basis, that prospective client will not know to call that law firm's intake number when the need for such services arises and, as a result, that prospective client will not retain that law firm.

**B.     Legal Advertising in the Relevant Legal Services Market**

47. In light of the above business considerations, it is a common and necessary practice for small personal injury and social security disability and workers' compensation law firms in the Greater Philadelphia Region, like Lundy and Pitt, to advertise their legal services through mass reach outlets, using constant messaging, saturation advertising in the most effective media outlets to obtain the most "bang for the buck."

48. The purpose of such advertising for law firms of this type is to obtain brand name recognition among potential clients and other referral sources.

49. Legal advertising is, however, governed by the restrictions of Rule 7.2 of the Rules of

11

Professional Conduct, thereby limiting the type and form of advertising permitted.  For example,

unlike other types of advertising, legal advertising cannot use professional endorsements or paid

client endorsements unless under certain limited circumstances.  Specifically, Pennsylvania Rule

of Professional Conduct 7.2(k) provides:

> A lawyer shall not, directly or indirectly, advertise that the lawyer or his or her
> law firm will only accept, or has a practice limited to, particular types of cases
> unless the lawyer or his or her law firm handles, as a principal part of his, her or
> its practice, all aspects of the cases so advertised from intake through trial. If a
> lawyer or law firm advertises for a particular type of case that the lawyer or law
> firm ordinarily does not handle from intake through trial, that fact must be
> disclosed. A lawyer or law firm shall not advertise as a pretext to refer cases
> obtained from advertising to other lawyers.

50. Mass reach, constant messaging, saturation advertising is the primary source of clients

for small personal injury and social security disability and workers' compensation law firms.

Such advertising has proven in practice to be the most effective and efficient way for such law

firms to establish and reinforce brand name recognition, and to distribute information about their

services to consumers.  Without it, law firms practicing in these areas are unable to compete

effectively and efficiently.

51. Such advertising has historically been available, with varying degrees of success and

efficiencies, in the following types of media outlets:  public transportation, radio, in and around

sporting events and concert venues, television, billboards, taxi cabs, bus and subway stops,

internet, newspaper advertisements and the Yellow Pages.

52. However, the most effective, and therefore most coveted, mass reach, constant

messaging, saturation advertisements that provide the greatest return for the cost spent are those:

(1) placed on the exteriors of buses; (2) aired on radio in prime time slots, such as rush hour and

during traffic updates; and (3) displayed inside arenas where sporting and concert events are

regularly held.

53. The effectiveness and efficiency of these forms of essential advertising as explained herein, and which will be subject to expert opinion, is far greater than that of other forms of advertising described above, like Yellow Pages, television, stationary billboards and the internet, etc. Therefore, advertisements in those prime time categories are both unique and essential, and they are not reasonably interchangeable with the other forms of advertising described above.

### C.   The Necessity of Bus-Exterior Advertisements to Effective and Cost-Efficient Competition in the Relevant Legal Services Market

54. It is essential for law firms in the relevant legal services market to, in particular, place advertisements on the exteriors of mass transit buses to compete effectively.

55. There is no economically viable substitute for bus-exterior advertising, and none of the available advertising alternatives are as effective and efficient because they cannot achieve the same consumer recognition that bus-exterior advertising does without costing a prohibitive amount of money.

56. SEPTA is a metropolitan transportation authority that operates in various forms of public transit, including trains and buses that serve 3.9 million people in the Greater Philadelphia Region.

57. Historically, Pitt and other small personal injury and social security disability and workers' compensation law firms have competitively advertised their legal services with SEPTA, including on the exteriors of buses, the interiors of buses, and at bus stops. This practice has taken place for at least ten years until recently, for reasons explained herein.

58. Pitt and other small personal injury and social security disability and workers' compensation law firms that historically have advertised their services on the exteriors of buses have never sought to restrict consumer access to competitors' advertisements through exclusive contracts in perpetuity. Nor did the Lundy Law firm seek such all encompassing restrictions

13

until Leonard Lundy assumed control over the firm from his uncle Marvin Lundy.

59. Buses serve as unique moving billboards, particularly in high-density neighborhoods, enabling maximum, repetitive brand name recognition saturation that is targeted to a far greater number of prospective clients than is reasonably possible through other forms of lesser advertising, like stationary billboards at a single location, television, Yellow Pages, and the Internet.

60. Indeed, as has been stated by Titan, the national advertising agency that has the exclusive right to sell advertisements on behalf of SEPTA and NJ Transit, "The ultimate mass reach medium, Exterior Bus Advertising is the most colorful, dynamic and cost-efficient form of advertising available today."

61. Titan touts the pervasive, mass reach and high visibility of its bus-exterior advertisements, claiming, "King size bus posters offer superior eye-level coverage and penetration, reaching commuters, workers and areas where traditional outdoor media is limited or unavailable" and "Bus Tails establish brand awareness. Mounted up high for visibility, this format reads to pedestrians while also commanding the attention of drivers."

62. This is true because the exteriors of buses (unlike the interior of buses) are viewed by individuals driving in their cars, from their homes or businesses, or simply standing or walking on the streets who may not ride buses; by individuals who may not attend sporting or concert events in person and thus are not exposed to advertising in that other essential media outlet; by individuals who may not own or regularly use a radio, television or computer or who do not view the particular programs or stations where the advertising appears, and thus are not exposed to advertising in those media outlets; and by individuals who may not see stationary billboards at a single location and thus are not exposed to advertising in that limited medium, because they

14

either do not drive or drive in areas without such billboards.  Therefore, as Titan has stated, exterior bus advertising uniquely reaches a mass audience of drivers and pedestrians with constant brand name messaging without the consumer necessarily even riding the bus.  It is virtually impossible to live in the Greater Philadelphia Region and not be continually exposed to exterior bus advertising on a daily basis.

63. According to the Arbitron Out-of-Home Advertising Study – 2013 Edition, "Over 4 in 10 (41%) of U.S. adults who have driven or ridden in any vehicles in the past month have noticed advertising on the side of a public bus."

64. As Arbitron further notes, "Walkers are watching too. Nearly half (48%) of those who have walked in a town, city or downtown area in the past month also noticed a bus side ad."

65. The U.S. census reported the population of the Philadelphia 5-county area that SEPTA services is 4,050,793. (Philadelphia, Bucks, Chester, Montgomery, and Delaware counties).

66. SEPTA buses run on 170 bus routes throughout the Greater Philadelphia Region. Hundreds of buses operated by SEPTA are, by law, the only buses serving local routes in the Greater Philadelphia Region.  Therefore, mass reach, constant messaging, saturation advertising on bus exteriors is essential for such law firms, like Pitt, to effectively compete in the relevant market.

67. Titan has stated that "Over 1400 vehicles make up SEPTA's bus fleet," and that "1390 vehicles travel 1445 (one way) miles along 117 bus routes every day."

68. Moreover, Titan has stated that "over 2.4 million individuals see a Titan bus ad every day" and "over 74 million individuals see a Titan bus ad every month" and "over 880 million individuals see a Titan bus ad every year."

69. However, according to Titan's own figures only, "On average, 651,153 people ride a

15

SEPTA bus every day."

70. Therefore, according to Titan, 2.4 million individuals see a Titan bus advertisement in the Greater Philadelphia Region each day, but only 651,153 people ride a SEPTA bus each day, meaning that the resulting difference of 1,748,847 people see Titan bus-exterior advertisements each day.

71. In other words, bus-exterior advertisements reach more than two and a half times the number of people who actually ride a SEPTA bus and would be exposed to Titan bus-interior advertisements.

72. Accordingly, advertising on the exteriors of buses is a critical decision influencer for a large segment of potential clients of small personal injury and social security disability and workers' compensation law firms.  As stated in the commentary to Rule 7.2. ("the public's need to know about legal services can be fulfilled in part through advertising.  This need is particularly acute in the case of persons of moderate means who have not made extensive use of legal services.")

73. Historically, Pitt has advertised its legal services with SEPTA through Titan, including on the exteriors and interiors of buses.  Pitt has purchased such advertisements since at least 2007.

74. Based on its past relationship with Titan and SEPTA, Pitt reasonably anticipated entering into future agreements for the placement of advertisements on the exteriors of SEPTA buses.

75. There is no rational economic reason why Titan would not have sold Pitt bus-exterior advertisements in the absence of external restraints caused by Lundy's conduct preventing Titan from doing so.

76. BARTA is a transportation authority that provides the bus and shuttle service in Berks

County, Pennsylvania, with its primary services in the city of Reading, Pennsylvania. The U.S. census reported the population of Berks County serviced by BARTA to be 413,491. Historically, Pitt has advertised its legal services with BARTA, including on the exteriors and interiors of buses, and would have continued to do so (given that it has an office in Reading) but for Lundy's conduct, as defined herein.

77. Exterior bus advertising is the anchor of any adverting campaign in the BARTA market. Other forms of advertising can supplement the name recognition achieved by exterior bus advertising, but standing alone are far less effective for the money spent. Lundy has had since 2011, an exclusive contract with BARTA, which is de facto renewable in perpetuity at Lundy's sole discretion.

78. Lundy also has had since 2011, a similar exclusive contract, which is de facto renewable in perpetuity, at Lundy's sole discretion, with DART, thereby increasing its mass reach exposure throughout the State of Delaware. The U.S. census has reported the population of Delaware that is serviced by DART to be 917,092.

79. Moreover, on information and belief, Lundy has a similar exclusive contract, which is de facto renewable in perpetuity, at Lundy's sole discretion, for the exteriors of buses for NJ Transit, which operates in Southern New Jersey (with a U.S. census population of 2,430,216) and also operates in Philadelphia.

### D. The Limited Effectiveness and Efficiency of Other Forms of Advertising as Compared to Bus-Exterior Advertising

80. It is crucial that small personal injury and social security disability and workers' compensation law firms be able to advertise on the exteriors of buses because other forms of advertising are not nearly as effective or efficient and, therefore, not reasonably substitutable.

81. For example, in the past, Pitt has extensively advertised in the Yellow Pages, but has

17

vastly reduced such advertisements because they are rarely seen by prospective clients, who no longer consider the Yellow Pages a worthwhile source of such information. Moreover, because many households no longer have hard line telephones, Yellow pages are usually not distributed to them. Nor does Lundy any longer advertise in the Yellow Pages.

82. Pitt has also advertised on roadside stationary billboards. These have limited effectiveness because they are only viewed by passing motorists at a particular location where billboards are permitted. Prospective clients who do not drive would not be exposed to such billboards.

83. Furthermore, the effectiveness of roadside stationary billboards will likely be further limited by a recently proposed local ordinance in Philadelphia that will ban all new billboards within the city limits. The ordinance grandfathers some existing billboards but forbids the erection of any new billboards.

84. Specifically, the changes to be implemented under the proposed ordinance include: (1) a ban on all new billboards; (2) a rule that existing static billboards could be converted to digital in certain parts of the city, but only if the owner removes two other static billboards; (3) a cap on how bright digital billboards could be; (4) higher licensing fees; and (5) the legalization of existing non-conforming billboards.

85. Likewise, small personal injury and social security disability and workers' compensation law firms have found that the internet is not as effective or efficient a form of advertising as bus exteriors because the sheer volume of information available on the internet makes it virtually impossible for one law firm to distinguish itself from others in the relevant market; there is no guarantee that a paid advertisement on the internet will ever be seen by prospective clients who have access to the internet; and internet advertisements are not on display on a constant and

18

repetitive basis, as are bus-exterior advertisements.  Moreover, according to the Outdoor

Advertising Association of America, the internet has "limited frequency across websites, with

users able to access only a fraction of sites available; privacy and security concerns."  Finally,

not all consumers have computers or regularly use the internet.

86. Advertising on the roofs of taxicabs also has very limited effectiveness because of the

extremely small size of the limited rooftop displays to send an advertising message.  Moreover,

taxi cabs do not have the same service area as buses, particularly in the suburbs.  Lundy chooses

not to advertise on taxi cabs.

87. Television advertising is increasingly ineffective while remaining costly.  According to

the Outdoor Advertising Association of America, expensive television advertising has the

following disadvantages: "Audience share is generally declining due to fragmented audiences;

Increasing use of DVRs diminishes the impact of commercials; Many television shows skew

older and lower income; Typically high [cost per thousand] and rising production costs;

Primetime is no longer the preeminent reach builder with a large part of the viewing population

not substantially reached by primetime networks; Increasing ad clutter as commercial pods

lengthen."  Furthermore, "The growth in available channels and programming has led to

unprecedented broadcast audience fragmentation making it increasingly difficult for brands to

reach sizable television audiences without excessive ad spending."

88. For example, the Comcast cable platform in the Greater Philadelphia Region offers up to

200 channels.  Dish Network offers up to 290 channels.  The FIOS service offers up to 380

channels.  Therefore, reaching a significant number of paying viewers on any single channel at

regularly viewed times or even on several channels has become exceedingly difficult and not

cost justified for constant messaging, saturation advertising.

89. Nor is newspaper advertising an effective or efficient way of gaining brand name recognition. According to the Outdoor Advertising Association of America, such advertising, which is seen only once daily by a given reader who buys a newspaper, has the following disadvantages: "Decreasing market penetration and readership with many newspapers reaching less that 50 percent penetration; Low younger audience (18-24) readership; Costly frequency medium; Some ad recall studies show less than 50 percent of newspaper readers recall noting ads; Ad clutter." Additionally, as only daily mediums, "Newspapers have a short shelf life." Therefore, their visibility to readers is short lived within the diminishing number of newspapers printed in the Greater Philadelphia Region.

90. The above alternatives to bus-exterior advertising do not entail the type of continuous, constant messaging that a bus exterior (which is observed free of charge by the viewing public) affords. Therefore, in purchasing the above less effective advertisements, a small personal injury and social security disability and workers' compensation law firm quickly reaches a point of diminishing returns where a greater advertising expenditure does not result in more clients contacting that law firm.

91. Thus, while other advertising may be considered as a supplemental form of marketing, the inability of a small personal injury and social security disability and workers' compensation law firm to advertise on bus exteriors effectively cripples that firm's brand name recognition. Also, consumers are often quick to conclude that a law firm that no longer advertises on bus exteriors may no longer be in existence or by its absence less economically viable or that it no longer provides the types of services commonly advertised on the exteriors of buses, or otherwise no longer has a significant presence in the relevant market.

20

### E. The Most Effective and Efficient Use of Other Mass Reach, Constant Messaging Saturation Advertising as Supplements to Bus-Exterior Advertising

92. As set forth above, the perception and understanding among small personal injury and social security disability and workers' compensation law firms in the relevant geographic market, including Lundy and Pitt, is that advertising on the exteriors of buses is the most effective and efficient way of achieving brand name recognition and exposure to a wide variety of consumers.

93. Such law firms do commonly use other (albeit less effective and efficient) forms of mass reach, constant messaging, saturation advertising, including advertisements on the radio and at sporting and concert events.

94. However, not all advertising within the various categories of these alternative forms of advertising is equally effective or efficient. For example, within the category of radio advertisement, the most effective and efficient advertisements are those aired during traffic and weather reports during rush hour. These are the most influential and sought after advertising spots in these media outlets.

95. KYW News Radio has a 5.6 Arbitron rating in the Philadelphia market which is third highest among all radio stations AM and FM. The next highest news radio station has a rating of 2.3.

96. According to KYW's website, "Since [1965], KYW Newsradio has become **the** news source that more than 1.5 million listeners tune to each week for the latest on local, national and international news, weather, sports and traffic." (emphasis in original)

97. Lundy Law has a similar exclusive contract that is de facto perpetually renewable, at Lundy's sole discretion, with KYW News Radio preventing any other law firm from advertising during the top of the rush hour or the traffic reports.

98. Similarly, the most effective and efficient form of advertising at sports and concert venues in the relevant legal services market is advertising placed inside the largest indoor arena in the region, the Wells Fargo Center, which serves as the venue for numerous professional sports teams (*i.e.*, the Philadelphia 76ers, Philadelphia Flyers, Philadelphia Wings, and Philadelphia Soul), as well as concerts and other major events.  According to its website, "[t]he Wells Fargo Center hosts more than 250 events each year, including the Philadelphia Flyers, 76ers, Wings, college basketball, ice skating, Ringling Bros. and Barnum & Bailey Circus, Disney On Ice, Sesame Street Live, Harlem Globetrotters, wrestling, great concerts and more. The Wells Fargo Center is truly where everyone plays."  Thus, indoor advertising at the Wells Fargo Center is more effective and efficient than advertising at the two outdoor sports venues in the Greater Philadelphia Region, Citizens Bank Park and Lincoln Financial Field, each of which hosts only one sports team and limited events during the course of the year.  For example, Lincoln Financial Field, where the Eagles play, hosts only 8 regular-season home games per year.

99. Lundy has a similar exclusive contract that is de facto perpetually renewable, at Lundy's sole discretion, with the Wells Fargo Center.

100. Small personal injury and social security disability and workers' compensation law firms historically have competed vigorously among each other for the right to purchase radio advertisements aired during traffic and weather reports during rush hour, and for the right to purchase indoor advertising at the Wells Fargo Center.

101. Historically, Pitt has advertised on radio during rush hour and other prime time slots before being precluded from doing so by Lundy's exclusive contract in perpetuity with KYW News Radio.

102. Lundy's own advertising practices demonstrate that these types of advertisements are perceived by it as the most effective and efficient methods of advertising for law firms in the relevant legal services market.

103. Lundy does not advertise in the Yellow Pages and, upon information and belief, has significantly reduced its advertising other than the mass reach, constant messaging, saturation advertising described above.

104. Lundy focuses the majority of its advertising efforts on securing the most effective and efficient mass reach, constant messaging, saturation prime time advertising described above.

105. Such competition is eliminated when a single small personal injury and social security disability and workers' compensation law firm, like Lundy Law, enters into agreements providing for the exclusive right to run the above described types of premium advertisements with the right to renew in perpetuity because, as a result of the terms of such agreements, competing law firms are barred from even attempting to buy such advertising, which is locked up by the firm with such exclusive rights.

106. The existence of such exclusive agreements renewable in perpetuity in the relevant legal services market means that prospective clients have little or no choice of law firms for such legal services because law firms other than the one with the exclusive rights are effectively not known to prospective clients by brand name.

### F.   Lundy's False and Predatory Advertising

107. Lundy advertises itself through mass reach media outlets as a law firm with capabilities to handle workers' compensation and social security disability matters in Pennsylvania, New Jersey, and Delaware.

108. For example, many of Lundy's advertisements use some combination of the phrase "INJURY, DISABILITY & WORKERS' COMPENSATION" and indicate "PA • NJ • DE" as

the jurisdictions in which Lundy handles such matters.

109. Lundy's advertisements appearing on the exteriors of SEPTA buses characterize Lundy as "INJURY, DISABILITY & WORKERS' COMPENSATION LAWYERS" practicing in "PA ● NJ ● DE."

110. One of Lundy's advertisements appearing on the exteriors of SEPTA buses displays a photograph of two individuals, superimposed on which is the text "SOCIAL SECURITY CLIENT."

111. One of Lundy's advertisements appearing on the exteriors of SEPTA buses displays a photograph of two individuals, superimposed on which is the text "WORKERS COMP CLIENT."

112. None of the above advertisements indicate that Lundy does not handle workers' compensation and social security disability matters in any of the jurisdictions identified (Pennsylvania, New Jersey, and Delaware), or disclose that Lundy may refer such cases to other lawyers outside of his firm.

113. Lundy does not handle workers' compensation or social security disability matters in some or all of the jurisdictions its advertisements identify.

114. Instead, Lundy accepts inquiries from potential clients who view Lundy advertising and seek representation in such matters, collects intake information from the callers, and then refers them to other lawyers in other law firms to handle their workers' compensation and social security disability matters in the relevant jurisdictions.

115. The "Practice Areas" section of Lundy's firm website includes individual pages regarding "Workers' Compensation" and "Social Security Disability."

116. The website, however, does not identify a single social security disability lawyer employed by Defendant Lundy Law, LLP, and the only workers' compensation lawyer it identifies is Lenard A. Cohen, Esquire, who is actually employed by another law firm, and not by Defendant Lundy Law, LLP as advertised.

117. Neither the Pennsylvania Supreme Court Disciplinary Board records for Mr. Cohen nor Mr. Cohen's Martindale-Hubbell entry identify any association between Mr. Cohen and Defendant Lundy Law, LLP.  Instead, they both identify Mr. Cohen's law firm as "Lenard A. Cohen, P.C."

118. Lundy's advertisements fail to disclose to their intended audience that Lundy itself will not handle some or all workers' compensation and social security disability matters.  This is in violation of Pennsylvania Rule of Professional Conduct 7.2, which provides, in relevant part:

> A lawyer shall not, directly or indirectly, advertise that the lawyer or his or her law firm will only accept, or has a practice limited to, particular types of cases unless the lawyer or his or her law firm handles, as a principal part of his, her or its practice, all aspects of the cases so advertised from intake through trial. If a lawyer or law firm advertises for a particular type of case that the lawyer or law firm ordinarily does not handle from intake through trial, that fact must be disclosed. A lawyer or law firm shall not advertise as a pretext to refer cases obtained from advertising to other lawyers.

Pa. R.P.C. 7.2(k).

119. In effect, by failing to disclose in its advertisements that it does not handle all aspects of workers' compensation and social security disability cases from intake through trial, Lundy uses its advertisements as a pretext to lure potential clients into its intake process so that it can treat their identities and information as assets to be sold or traded to other lawyers seeking workers' compensation and social security disability business.

120. Such advertisements are false, misleading, unethical, and anticompetitive.

121. Such advertisements also help to monopolize or attempt to monopolize the market for

personal injury, social security disability and workers' compensation matters by siphoning off clients that might otherwise retain Pitt or another competitor who do, in fact, handle such matters.

### G.      Lundy's Exclusive Perpetually Renewable Advertising Contracts

122. During at least the past three years, Lundy has sought and achieved the exclusion of competitors from advertising in the relevant legal services market, an overall reduction of competition in the relevant legal services market, and a severe narrowing of consumer choice in the relevant legal services market, by entering into exclusive advertising contracts with de facto options to renew in perpetuity, at Lundy's sole discretion, and by utilizing the false and predatory advertising techniques described herein.

123. Lundy uses its exclusive access to the most effective and efficient prime time advertising in the relevant legal services market to place the false advertisements described above, allowing Lundy to control ever-increasing proportions of client referrals in the relevant market, which it in turn refers to its partner law firm co-conspirators.

124. In selecting which advertisements to secure on an exclusive basis, Lundy has specifically targeted the most cost effective and efficient forms of mass reach, constant messaging media outlets and spots, including with SEPTA, BARTA, DART and NJ Transit for the exteriors of buses, during the prime rush hour on KYW Newsradio, and at prime sports and concert arenas, like the Wells Fargo Center in Philadelphia.

125. Lundy's exclusive advertising contracts prevent any and all other competing legal service providers, including Pitt, from advertising in these advertising outlets entirely and in perpetuity unless Lundy agrees to forego his exclusive rights.

126. Lundy's exclusive advertising contracts with SEPTA are for a period of at least one year, with automatic, unlimited advance renewals for additional one-year periods in perpetuity.

Nothing under the terms of Lundy's exclusive contract allows SEPTA and Titan to increase the price Lundy pays for advertising.  Leonard Lundy's first exclusive contract with SEPTA/Titan began in December 2011, it has been continually renewed at the same price, and it is still in effect and enforced by Titan and others.  Because there is no limit on the renewal provision, Lundy's exclusive advertising contracts is an exclusive contract existing in perpetuity, at Lundy's sole discretion, or for as long as Lundy wishes to continue to renew.

127. Because the renewal clause does not provide for or contemplate any opportunity for another competitor to submit its own bid for the exclusive advertising rights, it is not possible for a competitor to approach Titan at the expiration of the term of one of Lundy's contracts and offer to pay more to secure the same exclusive rights in the following year.

128. Pennsylvania statutory law permits mass transit agencies to seek open bidding for advertising placement on their rolling stock.  *See* 74 Pa.C.S.A. § 1741(a)(24).  *See also* 74 Pa.C.S.A. § 1750.  Titan and SEPTA have refused to allow such open bidding for the exterior of buses despite the fact that competitive open bidding could result in greater revenues for both Titan and SEPTA.  Therefore, the decision by Titan and SEPTA to not allow for such open bidding is economically irrational.

129. In fact, even when competitors of Lundy have approached Titan and offered to pay more than Lundy's exclusive prices, they have been told that such a higher offer could not be accepted by Titan on behalf of SEPTA because of the terms of Lundy's exclusive contract.  This refusal to accept higher prices from competitors also constitutes economically irrational behavior by Titan and SEPTA.  It is also economically irrational for Titan and SEPTA to enter into a contract with Lundy that prevents them from increasing the price he pays for advertising at the end of each year.  Therefore, Lundy has paid the same price for the past three years.

130. Specifically, in at least one instance, Titan, acting on behalf of SEPTA, rejected an offer made by Rand Spear of Spear, Greenfield & Richman, P.C., to purchase exterior bus advertising at proposed rates that were higher than the more than $400,000.00 Lundy was paying and continues to pay each year for his exclusive SEPTA contract.

131. Titan's decision to refuse such a higher offer is also economically irrational.

132. L. Leonard Lundy has been personally involved in negotiating the exclusive advertising contracts in question and has authorized their execution on behalf of Lundy Law, LLP.

133. By securing the exclusive advertising contracts described above, Lundy has made its name and branding ubiquitous in the relevant legal services market, at the expense of its competitors' names and branding.

134. Pitt and other competitors have attempted to renew their own advertising contracts and/or enter into new advertising contracts with local outlets and media in the relevant market, including with SEPTA, BARTA, DART, NJ Transit and KYW, but have been foreclosed from doing so as a direct result of Lundy's exclusive contracts.

135. Other small personal injury and social security disability and workers' compensation law firms in the relevant legal services market, including Hill & Associates, P.C.; Spear, Greenfield & Richman, P.C.; and others, have similarly attempted to renew or purchase advertising from the above entities and have been foreclosed from doing so as a direct result of Lundy's exclusive contracts, including in the past month, as discussed herein.

### 1.  Lundy's Exclusive Perpetually Renewable Deal with Titan and SEPTA

136. Titan is the national advertising agency that has the exclusive right to sell advertisements on behalf of SEPTA in the Greater Philadelphia Region.

28

137. Lundy, Titan, and SEPTA have engaged in concerted action to preclude any law firm, other than Lundy Law, LLP, from purchasing the highly coveted and necessary advertisements that SEPTA places on the exteriors of its buses.

138. Beginning in February 2011, Lundy entered into the first of a series of agreements with Titan under which Lundy is the only law firm permitted to place certain types of advertisements on the exteriors of SEPTA buses in perpetuity at the same price, at Lundy's sole discretion.

139. In each year, since the exclusive contract began in 2011, no competing law firm was permitted to bid against Lundy for a similar deal, even though the terms of Lundy's exclusive contract gave Lundy the right to renew at the same price set forth in the previous contract, which he has done, including for the upcoming 2014 year.

140. As obtained through recent Right-to-Know Law requests to SEPTA, the first exclusive contract between Lundy and Titan, executed sometime between February 2011 and May 2011, provided for "12 weeks exclusivity on reflective tails in all cateogories [sic] beginning 5/16/11" and, "Full exclusivity of reflective tails in law category."

141. Following the expiration of the first exclusive contract, Lundy sought to expand the scope of its exclusivity.

142. The second exclusive contract, executed on or about November 10, 2011, contained more detailed provisions, including a specific term and a provision giving Lundy an exclusive right to renew the agreement, at his sole discretion, upon its expiration, on identical contract terms, including price.

143. Specifically, the second exclusive contract provided, in relevant part, "Lundy Law is to receive advertising exclusivity in the law firm category on the exterior of all SEPTA buses during the paid term of the contract 1/30/12- 12/30/12. Exclusive option to renew on 11/1/12 at

same price.  January 30, 2012-Decmber 30, 2012 non-cancellable contract.  No other lawyer may have an exclusive during Lundy Law paid contract time of exclusivity."

144. Thus, the effect of Lundy's second exclusive contract with Titan, originally executed in 2011, was to give Lundy the right to renew the exclusive deal repeatedly year-to-year, in perpetuity or for as many consecutive years as he pleases, for the same price.

145. The renewal provision of the exclusive contracts thus amounts to an exclusive right of first refusal that indefinitely precludes any other law firm in the relevant legal services market from seeking bus-exterior advertising with SEPTA, on either an exclusive or a non-exclusive basis.

146. No language in any of the exclusive contracts provides for or contemplates an opportunity for competitors to offer Titan a better deal for bus-exterior exclusivity.  In fact, the renewal provision by its terms forecloses such offers because Titan is not permitted to entertain any competing offers unless and until Lundy decides, in his sole discretion, not to renew the contract in a given year, which he has refused to do to date.

147. Indeed, Lundy's exclusive contract with SEPTA also precludes any law firm from having an exclusive contract for advertising in the interiors of buses and trains and subway cars and subway stations:  "No other lawyer may have an exclusive during Lundy Law paid contract time of exclusivity."

148. In the past, Lundy Law had placed advertisements on the exteriors of buses on a non-exclusive basis, such that other law firms were permitted to seek and bid competitively for the right to place such advertisements, including Pitt, Leonard K. Hill, Rand Spear, and others.

149. During the term of the second exclusive contract, Pitt attempted to renew its contract for advertisements on the exterior of SEPTA buses, and was informed that Lundy's advertising

contract with SEPTA prevented SEPTA, through Titan, from contracting with any other legal service providers for advertising anywhere on the exteriors of buses, for at least one year, with unlimited one-year renewal options by Lundy.

150. On or about October 16, 2012, Lundy executed a third exclusive contract with Titan for the same price it had paid since 2011.

151. The third exclusive contract contained substantially the same terms as the first and second, providing, in relevant part, "Lundy Law is to receive exclusivity in the law firm category on the exterior of all Septa buses during the paid term of the contract 1/1/13-12/30/13. Exclusive option to renew on 11/1/13. January 1, 2013-December 30, 2013 non-cancellable contract. No other lawyer may have an exclusive during Lundy Law paid contract time of exclusivity."

152. Pitt recently learned that Lundy renewed its exclusive contract with Titan, again on identical terms, so that it will have the exclusive right to advertise on the exteriors of SEPTA buses through the end of 2014, again with an exclusive right to renew at the same price it had paid since 2011. Pitt attempted to place exterior SEPTA ads for the 2014 year but was told by Titan that such ads were still prohibited by Lundy's exclusive contract. Rand Spear was recently told the same thing.

153. Nothing in the 2014 exclusive contract between Titan and Lundy provides for competitive bidding or otherwise contemplates that Titan could accept even higher offers from other law firms for exclusive rights such as those Lundy has enjoyed since 2011. Therefore, Lundy Law continues to have its exclusive rights with Titan and SEPTA "locked up" at the same price in perpetuity.

154. As a result of Lundy's exclusive agreement with Titan, Pitt and all other competitors in the relevant market are now completely foreclosed from purchasing advertisements on the

31

exteriors of SEPTA buses in perpetuity until Lundy decides otherwise. Significantly, Titan or SEPTA has no right to cancel the exclusive contract with Lundy unless it is found illegal by a court, as expressed in an addendum specifically negotiated and executed by Titan and SEPTA with Lundy in November 2011, upon advice of SEPTA's counsel.

155. The addendum provides: "[I]n the event that either Titan or a [sic] SEPTA is enjoined by a third party from providing [the exclusive rights] to Lundy Law, Lundy Law/Titan Contract shall be terminated as to exclusivity and the Lundy Law/Titan Contract may be terminated or renegotiated at the option of Lundy."

156. As a result of Lundy's exclusive agreement with Titan, SEPTA is foregoing revenue it could otherwise generate by selling available advertising space to Pitt and similar law firms on a competitive basis, including on the exterior of buses that do not contain Lundy advertisements. Under the terms of Lundy's exclusive agreement with Titan, even such unused SEPTA inventory advertisement space is not available to any other lawyers. Nor can any lawyer have an exclusive contract on interior bus ads or bus or subway stops. Such conduct by Titan and SEPTA is economically irrational.

157. Lundy's exclusive agreement with Titan also provides Lundy with enormous bonuses that give it free and discounted interior bus advertisements, thereby significantly reducing the effectiveness of interior advertising space available for Pitt and other competitors. Specifically, Lundy's exclusive contract with Titan provides for bonus advertising, including 1,500 bus interior card advertisements. While other buyers of advertising also received bonus material with a paid purchase, the magnitude of Lundy's bonus material (driven by the premium paid for his exclusive contract) allows him to dominate even the interior of buses, thereby diluting any competing advertising in bus interiors.

32

158. Finally, Lundy's exclusive contract with Titan and SEPTA also precludes Pitt and other competitors from entering into an exclusive contract (at any price) as to the interior ads on SEPTA buses or subway cars and transit stations.  Such further restrictions are curtailing the maximum revenues that are obtainable for such interior ads and is, therefore, economically irrational for SEPTA and Titan.

        a.       **Lundy's Conspiracy With Law Firm Advertiser Partners to Preclude Competitors From Advertising on SEPTA**

159. In connection with its execution and repeated renewal of exclusive contracts with SEPTA, Lundy has further conspired with advertising partners (*i.e.*, competing law firms) to preclude competitors from purchasing advertisements on, in particular, the exteriors of SEPTA and Titan buses in perpetuity.

160. After instituting this action, Pitt was ultimately able to obtain documents from SEPTA pursuant to Pennsylvania's Right-to-Know Law.  Among the documents recently obtained through this very limited mechanism are e-mails evidencing that Lundy's exclusive and false advertising campaign was undertaken in concert with other competitor law firms.

161. The following e-mails outline the agreement between Lundy Law and partner law firms to act in concert to engage in the unlawful exclusive and false adverting campaign.  In an e-mail dated January 3, 2013, from Tami Sortman at Lundy Law, LLP, who handles advertising purchases for Lundy, to Sara Lundy (L. Leonard Lundy's daughter, who is an Account Executive at Titan, as discussed in detail below), Ms. Sortman stated, "As you know your dad is out of town until Wednesday of next week.  He is still trying to secure **our advertising partners** which will tell us our split for production." (emphasis added)

162. Upon information and belief, the "split for production" to which Ms. Sortman refers is the breakdown of how many advertisements contain the phrases "personal injury," "social

security disability," "workers' comp," "auto," "slip and fall," or any one or more of those phrases in various combinations and/or the financial contribution of each of the partners to the advertising campaign.

163. This "split" is discussed in an earlier e-mail from Ms. Sortman to Sara Lundy also dated January 3, 2013.  Therein, Ms. Sortman stated, "I think the interior cards with [sic] just be auto and slip and fall.  **Our partners** have not paid for the interior before."  (emphasis added)

164. Not all of the advisements Lundy runs through the exclusive contracts are the same.  For example, some advertise "Personal Injury, social security disability and workers' compensation claims."  Other advertisements mention only one of the three—including workers' compensation work that Lundy does not do but refers to "advertising partners."  The "split" of these advertisements depends on the financial contribution Lundy's competitors contribute to support the advertising scheme.

165. Thereafter, the competing firm of Pond Lehocky Stern Giordano ("Pond Lehocky") was approached by Sara Lundy to do interior bus advertising but decided not to do so around the same time Lundy stated that his "advertising partners" had decided to not do any SEPTA bus advertising.

166. Specifically, on May 23, 2013, after extensive discussions with Sara Lundy about advertising with SEPTA, a representative of Rajer Media, the advertising agency that handles advertising for Pond Lehocky, wrote to Sara Lundy:  "Unfortunately the partners did not approve our recommendations and want to stay away from transit entirely."

167. Accordingly, upon information and belief, Lundy and other competing partner law firms, including the firm of Pond Lehocky, have an arrangement whereby partner law firms refrain from purchasing certain types of advertisements competing with Lundy Law, on SEPTA

34

properties and instead pays Lundy Law for all social security disability and workers' compensation matters that are processed through Lundy's intake system by way of SEPTA bus-exterior and interior advertisements.

168. Lundy's false and predatory advertising practices are integral to the scheme and result in a mutual benefit to Lundy and its co-conspirators to the detriment of Pitt and other competitors.

169. Pond Lehocky advertises itself as "the largest law firm of its kind" headquartered in Philadelphia that exclusively handles workers' compensation and social security disability matters. It has five offices employing 24 lawyers throughout the Greater Philadelphia Region. Lundy has seven offices, employing 12 lawyers.

170. When Lundy is contacted through its false advertising by prospective clients with potential social security disability and workers' compensation claims, it refers many of such cases to Pond Lehocky.

171. Upon information and belief, Pond Lehocky pays Lundy a fee or otherwise compensates Lundy for Lundy's advertisements and resulting referrals.

172. The compensation Lundy receives from Pond Lehocky is another form of supra-competitive profits Lundy is able to extract due to its increasingly dominant position in the relevant legal services market.

173. Those supra-competitive profits assist Lundy in funding the continuation of the exclusive false advertisements on mass transit bus exteriors from year-to-year throughout the Greater Philadelphia Region.

174. The intent and effect of Lundy's conspiracy with partner advertising law firms, like Pond Lehocky, which are held out to the public as competitors, but, in fact, are working in concert, is to expand Lundy's already dominant market position through combination with its

partners, and further foreclose competition in the market for legal services provided by small personal injury and social security disability and workers' compensation law firms in the Greater Philadelphia Region from other competitors, including Pitt. This constitutes an illegal horizontal conspiracy under the antitrust laws.

### b. The Indispensable Role of L. Leonard Lundy's Daughter, Sara Lundy, in Enabling Lundy and Its Co-Conspirators to Secure and Maintain Exclusive Rights with SEPTA and NJ Transit.

175. Defendant L. Leonard Lundy's daughter, Sara Lundy, is an Account Executive at Titan.

176. Ms. Lundy began working for Titan in approximately March 2011.

177. At the time when L. Leonard Lundy's daughter joined Titan, numerous law firms, including Lundy Law, LLP, Pitt, Hill & Associates, P.C. and Spear, Greenfield & Richman, P.C., and others, purchased advertisements on the exteriors of SEPTA buses.

178. Less than a year after Sara Lundy began working for Titan; SEPTA, Titan and Lundy secretly entered into the above-described exclusive contract under which no other legal service provider except Lundy would be permitted to place any advertisements on the exteriors of buses in perpetuity nor could they have a similar exclusive on interior SEPTA bus or subway car ads or transit stations.

179. Sara Lundy has responsibility for selling advertisements through Titan on behalf of SEPTA and, upon information and belief, for NJ Transit as well.

180. As an Account Executive for Titan, Ms. Lundy has access to competitive information belonging to advertisers she represents, including small personal injury and social security disability and workers' compensation law firms that advertise with SEPTA and NJ Transit through Titan, including Pitt, Hill & Associates, P.C.; Spear, Greenfield & Richman, P.C.; and others.

181. Such information includes data related to advertising purchases, advertising spend, advertising strategies, advertising copy, and other commercially sensitive information.

182. As further detailed herein, documents recently produced by SEPTA and Titan, pursuant to Pitt's Right-to-Know Law requests, evidence that Ms. Lundy has provided such competitively sensitive information to her father, intentionally placing Lundy's competitors at a disadvantage.

183. Thus, Ms. Lundy, who acts on behalf of Titan and SEPTA, acts with the same intent to reduce or eliminate all competition for her father's law firm and its co-conspirators, and to benefit her father's law firm and its co-conspirators at the expense of competing law firms in the legal services relevant market, like Pitt.

184. Moreover, documents recently produced by SEPTA reveal that, in November 2011, around the time when Titan executed the exclusive advertising contract with Lundy, Titan raised with SEPTA the issue of a potential conflict of interest or other impropriety related to the fact that Sara Lundy handled her father's account at SEPTA and would be managing the relationship during the term of the exclusive contract(s).

185. In a recently obtained letter, dated November 23, 2011, from Jon Roche, Vice President and General Manager of Titan, to Dennis Hiller and James Dellipriscoli of SEPTA regarding the exclusive deal Titan negotiated with Lundy, Mr. Roche acknowledged that the deal with Lundy raised potentially problematic issues, including the fact that Sara Lundy was assigned as the Account Executive in charge of the Lundy account.

186. As Mr. Roche stated to SEPTA, "Titan would also like to note that the AE on this campaign is the daughter of the client.  We note this to also ensure that Titan management fully vetted the terms and decided the significant increase in billing for the category is in the best interests for SEPTA and Titan."

   **c.**  **Titan's Destruction of E-mails and Other Key**
      **Documents Relevant to Lundy's Exclusive Deal with**
      **Titan and SEPTA**

187. As part of its continuing factual investigation, Pitt issued requests pursuant to the

Pennsylvania Right-to-Know Law to SEPTA, BARTA, DART and NJ Transit and their

advertising agents, including Titan.

188. In the course of seeking responses to those requests, Pitt learned from counsel for

SEPTA that certain highly relevant documents in the possession of Titan had been "lost."  Those

documents claimed to be "lost" specifically related to Lundy and his dealings with Titan and

SEPTA.

189. Specifically, SEPTA's counsel was told by Titan that all e-mails prior to August 2012

and from Jon Roche, Titan's Vice President and General Manager in Philadelphia, who was

directly involved in negotiating and executing exclusive advertising deals with Lundy on behalf

of SEPTA, had been "lost" in the course of "archiving his e-mails."

190. Counsel for SEPTA later stated that Titan had told him Mr. Roche's e-mails "became

corrupted" and that no back-up tapes had been maintained until recently.

191. Counsel for SEPTA also relayed to Pitt's counsel that the e-mails of all account

executives at Titan who worked on Lundy's account at any time, except Sara Lundy, have

similarly been lost or destroyed and their laptops were not segregated after they left the

employment of Titan but instead recycled.  Therefore, all their e-mails were "not retrievable" as

well.  Further inquiries by Pitt's counsel directed to Titan's counsel about the e-mail destruction

received no response.

192. While Pitt has received certain limited Titan documents from SEPTA dated after August

2012, the documents received raise serious concerns about the content of e-mails to or from Mr.

Roche that were "lost," as well as other former Titan employees who it is understood had worked on the Lundy Law account prior to their departure.

193. At the same time, the recent Right-to-Know Law requests uncovered that after SEPTA received the November 23, 2011 letter discussed above (which was produced by SEPTA, not by Titan), an e-mail exchange ensued on November 28, 2011 and November 29, 2011, in which SEPTA representatives, including its General Counsel, noted the potential illegality of Lundy's exclusive contract with Titan and SEPTA.

194. On November 28, 2011, Lauren Tasciore of Titan transmitted the November 23, 2011 letter by e-mail to Mr. Dellipriscoli and other SEPTA representatives.

195. The same day, Mr. Hiller forwarded the letter to Mr. Dellipriscoli and Thomas Kelly (of SEPTA) in an e-mail stating, "we should forward to legal for review."

196. Within hours, the letter was forwarded to SEPTA's General Counsel, James Jordan, for review and analysis. SEPTA has withheld that analysis on the basis of attorney-client and common defense privilege, even though it was forwarded to Mr. Roche, a non-lawyer and non-client of SEPTA's counsel.

197. Ultimately, Lundy and Titan executed an addendum, dated December 7, 2011, stating that the exclusive deal would only be terminable upon a finding of illegality, and that the contract could be renegotiated at Lundy's option. "[I]n the event that either Titan or a [sic] SEPTA is enjoined by a third party from providing [the exclusive rights] to Lundy Law, Lundy Law/Titan Contract shall be terminated as to exclusivity and the Lundy Law/Titan Contract may be terminated or renegotiated at the option of Lundy." Therefore, under the terms of the exclusive Lundy contract, it cannot be terminated by Titan or SEPTA or renegotiated in price or terms unless and until Lundy agrees otherwise or a court enjoins the enforcement of the contract.

198. According to Mr. Roche, in an e-mail to James Dellipriscoli dated January 18, 2012 (produced by SEPTA) the addendum "protects [Titan and SEPTA] in case Titan or SEPTA are sued."

199. The pre-August 2012 e-mails Mr. Roche and the other departing employee e-mails that have been lost or destroyed would have been highly relevant to the legal issues raised by the Lundy exclusive contract.

200. Specifically, in the November 23, 2011 letter produced by SEPTA (not Titan), Jon Roche also discusses Titan's analysis of the possibility of a conflict of interest arising from Sara Lundy's handling of her father's account, which issue he said Titan had "vetted."

201. Pitt has received no e-mails to or from Mr. Roche or anyone else at Titan concerning the alleged internal vetting of the Sara Lundy conflict of interest or even the negotiations or issues concerning the exclusive deal with Lundy, that were raised in the November 23, 2011 letter.

202. Nor has Pitt received any e-mails dated to or from other Titan representatives who were involved in handling the Lundy account that address or discuss that letter or the conflict of interest or exclusivity issues raised therein. The absence of such e-mails raises an adverse inference that those e-mails are among the ones purportedly lost or destroyed as a result of the August 2012 "archiving."

203. Importantly, Titan and SEPTA were on notice of the potential for a legal action against one or both of them related to the exclusive contract with Lundy as early as November 23, 2011.

204. Indeed, SEPTA has represented in an appeal filed with the Commonwealth's Office of Open Records from Pitt's Right-to-Know Law requests, that Titan and SEPTA were acting in furtherance of a common legal defense in late 2011 because of their concern about anticipated litigation over the Lundy/Titan exclusive contract.

40

205. Specifically, SEPTA has represented to the Commonwealth, that, at the time of the November 2011 privileged e-mails discussed above, "The interest [in the Lundy exclusive contract] was not exclusively of a commercial nature. In fact, the commercial and business arrangement had long been established and the issue discussed in those e-mails related to the common legal interest of protecting Titan and SEPTA from potential litigation or liability stemming from an arrangement with a third-party, namely Lundy."

206. Nevertheless, Titan did not take reasonable steps to preserve all relevant documents thereafter related to the Lundy exclusive contract, as evidenced by the August 2012 "archiving" error, the failure to maintain backup tapes before then, and the failure to preserve and protect the e-mails and laptops of other Titan Account Executives who had worked on the Lundy account prior to their departures. Pitt has been prejudiced in its investigation and prosecution of this case by Titan's loss or destruction of such highly relevant e-mails and a default judgment or, at least, an adverse inference should be drawn against Titan.

### d. Attempts of Competitors to Advertise on the Exteriors of SEPTA Buses That Have Been Thwarted Due to Lundy's Exclusive Deal

207. Other law firms have attempted to purchase advertising on the exteriors of SEPTA buses, and have been told, either by Sara Lundy herself, by Mr. Roche, or by other Titan representatives, that they are foreclosed from purchasing any such advertisements because Titan and SEPTA have an exclusive advertising agreement with Lundy under which no other providers of legal services are permitted to purchase advertisements on the exteriors of buses.

208. Specifically, Rand Spear, Founder and Principal of Spear, Greenfield & Richman, P.C., purchased advertisements on the exteriors of SEPTA buses each year for six-month periods on approximately forty buses at a time from approximately 2006 until October 2011.

41

209. Numerous clients who contacted and ultimately retained Mr. Spear during this period told Mr. Spear that they had learned about his law firm from seeing his name, face, and telephone number on the exteriors of SEPTA buses.

210. Mr. Spear viewed, and continues to view, advertisements on the exteriors of buses as the most effective and efficient form of advertising for firms such as his, because they reach an audience consisting of individuals who may not have a computer or regularly watch television, and thus are unable to find his advertisements on the internet, television or have access to Yellow Pages.

211. In early 2012, Mr. Spear contacted Jon Roche of Titan to purchase the same advertisements he had been running the previous five years.

212. Mr. Roche told Mr. Spear that he could no longer place advertisements on the exteriors of buses because of an exclusive agreement Titan and SEPTA had with Defendant Lundy Law, LLP.  He also told Mr. Spear that L. Leonard Lundy's daughter, Sara Lundy, was handling the Lundy account.

213. In response, Mr. Spear told Mr. Roche that he would be willing to pay a higher rate for the exterior bus advertisements than was being paid by Lundy Law.  Mr. Roche told Mr. Spear that even a higher price could not buy him any advertisements on the exteriors of any SEPTA buses, because Lundy had an exclusive agreement for such advertisements that it could renew yearly in perpetuity.  Indeed, Mr. Roche said to Mr. Spear that Lundy had "locked out all other lawyers" from advertising on the exterior of SEPTA buses **"forever."**

214. Mr. Spear also asked Mr. Roche if he could, at least, buy the inventory on the exterior of buses that did not contain a Lundy advertisement.  Mr. Roche told him that such unused

inventory was also not available under the terms of Lundy's exclusive agreement with Titan and SEPTA. Titan's refusal to sell such unused inventory is economically irrational.

215. In early 2013, Mr. Spear again called Titan to inquire about renewing his advertisements on the exteriors of SEPTA buses.

216. A representative of Titan told him that Lundy still had the exclusive right to place such advertisements, and that no other provider of legal services was permitted to purchase any advertisements on the exteriors of SEPTA buses.

217. Within the past month, Mr. Spear again asked Mr. Roche if he could advertise on the exteriors of SEPTA buses. He was told by Mr. Roche that Lundy Law had exercised its option and renewed its exclusive contract for 2014, and therefore, Mr. Roche told Mr. Spear once again that he could not purchase any SEPTA bus-exterior advertisements.

218. Leonard K. Hill, Managing Partner of Hill & Associates, P.C., met L. Leonard Lundy's daughter. She introduced herself and stated that she was an Account Executive for Titan.

219. Leonard K. Hill, who advertises his law firm in various media, was made aware by Sara Lundy that Titan has the exclusive right to sell advertisements on behalf of SEPTA.

220. Leonard K. Hill told L. Leonard Lundy's daughter that he intended to contact Titan to inquire about commencing advertising on the exteriors of SEPTA buses.

221. L. Leonard Lundy's daughter told Leonard K. Hill that it was impossible for him to purchase such advertising, because her father and his law firm, Defendant Lundy Law, LLP, have an exclusive agreement with Titan and SEPTA, which gives Lundy the sole right to place advertisements on the exteriors of SEPTA buses.

222. L. Leonard Lundy's daughter gave Leonard K. Hill her business card and she stated that he was welcome to contact her about other advertisements, *e.g.*, on the interiors of buses and

trains, which Leonard K. Hill believed were the far less effective and less efficient advertisements than those on the exteriors of SEPTA buses.

223. Leonard K. Hill engaged Titan for purposes of seeking advertising opportunities not currently foreclosed by Lundy's exclusive agreement, based on Titan's promise that he may later be able to secure advertising on the exteriors of buses if and when Lundy's agreement expires and Lundy decides not to renew it.

224. While meeting with Sara Lundy and another Titan representative, Leonard K. Hill inquired about what he believed to be a conflict of interest resulting from L. Leonard Lundy's daughter's simultaneous representation of her father's law firm and other, competing law firms such as Hill & Associates, P.C.

225. Sara Lundy responded to Leonard K. Hill that she believed she could represent both Mr. Hill's firm and her father's firm and that would not be a conflict of interest.

226. Other competitors of Pitt and Lundy have also contacted Titan to inquire about advertisements on the exteriors of SEPTA buses, and been referred to L. Leonard Lundy's daughter as the Titan representative handling such advertising services.

227. Sara Lundy has told other competitors of Pitt and Lundy about her father's exclusive deal with SEPTA and that, because of it, they would be unable to advertise on the exterior of buses unless and until her father agreed they could do so.

228. Other competitors have voiced their concern and discomfort to Titan about L. Leonard Lundy's daughter simultaneously handling both her father's advertising with SEPTA and the advertising of other, competing law firms. Such concerns were not and still have not been addressed by Titan.

229. Sara Lundy continues to serve as an Account Executive at Titan for both her father's law firm and competing law firms as to advertisements with SEPTA.

230. In the past few weeks, Pitt contacted Titan to see if the Lundy Law exclusive contract had been renewed by Lundy. Titan said it had been renewed by Lundy and, therefore, for the third straight year, Pitt could not advertise on the exteriors of SEPTA buses at any price.

## 2. Lundy's Other Exclusive Advertising Deals With Other Transit Agencies

231. Lundy has also executed similar exclusive contracts for advertising with other public transit agencies, including DART and NJ Transit.

232. Lundy signed a contract for advertising with DART, dated September 12, 2012, that provided for "Exclusive Personal Injury advertising on DART NCC."

233. The contract with DART dated September 12, 2012 had a duration of six months.

234. Lundy signed a contract for advertising with DART, dated March 13, 2013 that again provided for "Exclusive Personal Injury advertising on DART NCC," and was again for a duration of six months with the right for Lundy to renew the contract in perpetuity at his discretion.

235. Upon information and belief, Lundy also has a similar exclusive agreement for exclusive advertising rights with the right to renew in perpetuity, at Lundy's sole discretion, with NJ Transit.

236. Titan sells advertising on behalf of NJ Transit, and it is believed that Sara Lundy also handles the NJ Transit account for Titan.

## 3. Lundy's Other Exclusive Advertising Deals

237. Lundy has entered into other advertising agreements under which no other similar legal service providers are permitted to purchase advertising in mass reach media outlets.

238. In negotiating and executing these deals, Lundy has strategically targeted the most effective and efficient methods of advertising for small personal injury and social security disability and workers' compensation law firms in the Greater Philadelphia Region.

239. Thus, while Lundy has not secured exclusive rights to every type of advertising available, he has systematically sought and amassed exclusive rights to the most effective and efficient advertising in each category, thereby foreclosing competing law firms from effectively competing with Lundy, Pond Lehocky, and their co-conspirators.

240. Lundy acts in concert with advertising partners such as Pond Lehocky and others and receives fees from those co-conspirators for placing its false and unethical advertisements on behalf of third parties, and Lundy demands unethical and illegal cash payments from doctors. These supra-competitive profits constitute more capital on hand for Lundy to pay for such exclusive deals than competing law firms have available to them derived from revenues legally earned from the practice of law.

241. For example, Lundy has secured exclusive rights to advertise on the exteriors of other transit agencies' buses. When Pitt, which has an office in Reading, attempted to renew its contract for the highly coveted advertisements on the exterior of BARTA buses in Berks County, Pennsylvania, Pitt was informed that Lundy's advertising contract with BARTA prevented BARTA from contracting with any other legal service providers for advertising anywhere on the exterior of buses, for at least one year, with unlimited one year de facto renewal options by Lundy at his sole discretion. Recent attempts by Pitt to obtain exterior ads on BARTA buses were met with the same refusal due to Lundy's renewed exclusive contract.

242. Similarly, Pitt has obtained in the past the right to place advertisements in the most efficient and effective media spots. When Pitt attempted to secure advertising with KYW

Newsradio for advertising around highly desirable traffic and weather spots, time checks and traffic sponsorships, Pitt was informed that Lundy's advertising contract with KYW Newsradio prevented KYW Newsradio from contracting with any other legal service providers for any and all of those prime time slots, for at least one year, with unlimited one year de facto renewal options by Lundy at his sole discretion. Recent attempts by Pitt to obtain prime time slots on KYW were rejected by KYW because Lundy had again renewed his exclusive contract.

243. The spots on KYW for which Lundy has obtained exclusive rights are the most effective and efficient spots available on KYW, which is among the most listened-to radio stations in the Greater Philadelphia Region.

244. Radio advertising is most effective if aired during peak drive time. According to the Outdoor Advertising Association of America, "Peak listening is during morning and evening drive times with relatively low audiences during other day parts." Because "[r]adio messages are susceptible to channel surfing," the only ones that achieve enough of an effect to be worth purchasing for competitors in the relevant market are those aired during rush hour, when commuters are in their cars and attentive to traffic and weather reports.

245. As L. Leonard Lundy himself said in a recent advertisement that airs on KYW, "KYW is the perfect place for us to deliver our safe driving tips. KYW allows us to deliver this unique message to the communities we serve. . . . Everybody listens to 'Traffic on the 2s,' I listen every morning."

246. Finally, Lundy has obtained the exclusive right to advertise inside the Wells Fargo Center, the largest indoor arena in the area that serves as the exclusive venue for the two winter season professional sports teams in Philadelphia, as well as countless indoor concerts and other events. When Pitt attempted to secure advertising with the Wells Fargo Center, it was informed

47

that Lundy's advertising contract with the Wells Fargo Center prevented the Wells Fargo Center

from contracting with any other legal service providers for any form of advertising in any

location within the massive arena, for at least one year, with unlimited one year de facto renewal

options by Lundy at his discretion.  Pitt's recent attempts to advertise within the Wells Fargo

Center were rejected because Lundy had renewed his exclusive contract, at his discretion.

247. Other law firms have attempted to purchase advertising with the Wells Fargo Center and

have been told that they are foreclosed from purchasing any such advertisements because the

Wells Fargo Center has an exclusive advertising agreement with Lundy under which no other

providers of legal services are permitted to purchase advertisements with the Wells Fargo Center.

### H.    The Anticompetitive Effects of Lundy's Exclusive Advertising Contracts and False Advertising

248. The effect of Lundy's conduct in securing the exclusive advertising rights described

above, and using them to place false and misleading advertising, has been to reduce or eliminate

competition in the relevant legal services market.

249. Lundy's exclusive contracts raise rivals cost by forcing them to advertise in other less

cost effective venues—or forego advertising altogether.

250. As described above, Lundy's false advertising scheme and agreement with his

advertising partners raises rivals' costs by unlawfully creating economies of scale that cannot be

matched by competitors operating lawfully and ethically.

251. Lundy's unlawful and unethical conduct has caused harm to Pitt and has substantially

foreclosed competition among small personal injury and social security disability and workers'

compensation law firms in the Greater Philadelphia Region.

252. Significantly, Lundy's exclusive advertising contracts described above have no

procompetitive effects, *e.g.*, assuring supply, price stability, outlets, investment, or best efforts,

or generally encouraging competition on the merits. Instead, they have the sole anticompetitive effect of preventing Pitt and other actual and potential competitors from obtaining brand name recognition and distributing information about their services to potential clients in a cost efficient manner.

253. As described herein, the advertising outlets with which Lundy has obtained exclusive agreements are well-established as the most effective, efficient, and popular outlets through which small personal injury and social security disability and workers' compensation law firms in the Greater Philadelphia Region advertise their legal services.

254. Access to the most effective and efficient forms of advertising is essential for small personal injury and social security disability and workers' compensation law firms to compete in the Greater Philadelphia Region.

255. Lundy's exclusive advertising contracts limit consumer choice by severely restricting potential clients' exposure to the names of, and information about, law firms other than Lundy; thereby reducing consumer bargaining power on the cost paid for their legal services.

256. Because Lundy and his advertising partners, like Pond Lehocky, divert prospective client inquiries into a single client intake process, through false and misleading advertising, the result of which is to refer all prospective clients to a single firm, the exclusive dealing arrangements into which Lundy has entered are more restrictive than they are economically useful.

257. Significantly, Lundy has proclaimed that since May 2011 it has been successful in becoming the "predominant advertiser of personal injury services."

258. Lundy has also admitted that, "Lundy Law has been almost continually the most prominent largest legal advertisers in Southeastern Pennsylvania, Southern New Jersey and

49

Delaware for years and, thus, one of the best known firms in the tri-state area."

259. Reflective of Lundy's anticompetitive intent is his public vow that, "I believe that, at the end of the day, the dominant brands will succeed."

260. Defendant L. Leonard Lundy has been personally involved in developing and approving Defendant Lundy Law, LLP's advertising and marketing strategies, including masterminding Lundy's predatory campaign with others, including Titan, to monopolize and to attempt to monopolize the legal services market as defined.  This campaign is intended to eliminate and/or minimize the competitive threat posed by Pitt and other similar law firms in the relevant legal services market.

## I.      Lundy's Other Predatory Conduct

261. Lundy, with others, has also engaged in further forms of predatory conduct to eliminate or undermine the competitive advertising of others and otherwise competitively harm Pitt and similar law firms, including, employing other forms of illegal, fraudulent and unethical conduct in concert with others, including medical healthcare providers.

262. This conduct has also included, but is not limited to, obtaining confidential and commercially sensitive information regarding competing law firms from Titan through Sara Lundy, filing sham litigation against Pitt, and demanding and receiving unethical and illegal cash payments from doctors in return for referring clients to those doctors as patients.

### 1.   Sara Lundy's Role in Enabling Lundy's Anticompetitive Practices

263. In her capacity as Titan's Account Executive assigned to handle the SEPTA account, Sara Lundy manages the relationship between Titan (on behalf of SEPTA), on the one hand, and any law firm seeking to advertise on SEPTA properties, including Pitt, Lundy, and Pond Lehocky, on the other.

264. Upon information and belief, Lundy purchases advertisements from NJ Transit on the same exclusive basis as he does with SEPTA. Upon information and belief, Sara Lundy handles the Lundy account with NJ Transit as well as other law firm accounts with NJ Transit.

265. Accordingly, Ms. Lundy has access to competitively and commercially sensitive information related to the advertising purchases of other law firms.

### 2. Titan's Sharing of Competitive Information with Lundy

The family relationship between Defendant L. Leonard Lundy and Sara Lundy allows Lundy to obtain such information and use it to make competitive decisions about what advertisements to purchase and how much to offer for them.

266. For example, Pitt has recently obtained from SEPTA an e-mail exchange between Sara Lundy and L. Leonard Lundy (that still exists) dated May 30 and May 31, 2013, in which Mr. Lundy requested from his daughter certain competitively sensitive information concerning the advertising purchases of other law firms from Titan and SEPTA. The same day as the request, Ms. Lundy proceeded to retrieve the information for her father, asking another Titan employee to provide it to her, which she did. Ms. Lundy then presumably provided that information to her father, though Mr. Lundy avoided creating any electronic record of such a transmission by instructing her, "I will call you so we are on the same page."

267. As an employee of Titan, Ms. Lundy's provision of such information to her father harms competitors because it permits Lundy to determine the minimum amount he can offer to Titan to secure certain advertisements, including by continuing to renew his exclusive contract at the same price with Titan in perpetuity, without competitors enjoying a similar advantage.

268. Competing law firms do not receive such information from Sara Lundy, and cannot formulate their advertising expenditure strategy on the basis of such invaluable inside information.

269. Nor do other law firms have a similar insider Account Executive working with advertising sellers who can alert them to opportunities not made public, or otherwise inform them as to the internal affairs of the advertising sellers.

270. Ms. Lundy's provision of such information to her father also benefits Lundy's co-conspirators, who receive client referrals from Lundy in exchange for various fees and other compensation. Such conduct by Ms. Lundy evidences her sharing with her father, on behalf of Titan, his anticompetitive intent against his competitors. As an employee and agent of Titan, Ms. Lundy's conduct is attributable to her employer because she was acting within the scope of her employment, particularly since Titan has knowledge of her conduct through her e-mail exchanges with her father and because other Titan employees are assisting her. Indeed, Titan conceded the possibility of a conflict of interest in employing Sara Lundy on her father's account as early as November 2011. Yet, Titan rejected those concerns repeatedly when raised by Lundy's competitors.

### 3.  Lundy's Predatory Sham Litigation

271. Lundy has also threatened and filed sham litigation with no good faith basis in law and fact in an attempt to interfere directly with the business relationships of his competitor Pitt. Specifically, in January 2013, Lundy sent a letter to Pitt alleging that Pitt's use in advertising of the phrase "REMEMBER THIS NUMBER" infringed on a trademark allegedly owned by Lundy on the phrase "REMEMBER THIS NAME," and demanding that Pitt cease and desist in its use of the phrase "REMEMBER THIS NUMBER."

272. On March 4, 2013, Lundy filed a baseless lawsuit against Pitt in this Court in a case titled *Lundy Law, LLP v. Larry Pitt & Associates*, Case 2:13-cv-01161-JHS (E.D. Pa.) (the "Trademark Lawsuit"), alleging it had various theories of trademark infringement and unfair competition related to Pitt's use in its advertising of the descriptive and instructional phrase

"REMEMBER THIS NUMBER" and claiming that Pitt's trademark infringement was causing "damage to Lundy Law's reputation and goodwill" such that it would suffer irreparable harm if an injunction was not timely granted. Defendant L. Leonard Lundy authorized the initiation and continuation of that baseless lawsuit against Pitt and verified under oath the Complaint filed therein.

273. Pitt had used the phrase "REMEMBER THIS NUMBER" in its advertising for almost a year, without any objection from Lundy, before Lundy filed the Trademark Lawsuit.

274. Lundy only began using the phrase "REMEMBER THIS NAME," which is not a registered trademark, in 2011.

275. Lundy used the phrase only as part of a larger slogan: "INJURED? REMEMBER THIS NAME. 1-800-LUNDY LAW."

276. At the time when the Trademark Lawsuit was filed, Lundy had changed its advertising, and did not even appear to be using the phrase "REMEMBER THIS NAME" in some or all of its advertisements.

277. The two common, ordinary, and generic phrases "REMEMBER THIS NAME" and "REMEMBER THIS NUMBER" are facially distinguishable from one another, unlikely to confuse consumers, and neither phrase, standing alone, identifies the source of the services being offered.

278. Lundy does not have, and never had, any legally protectable rights in the instruction to "REMEMBER THIS NAME."

279. The instruction "REMEMBER THIS NAME" is not inherently distinctive or suggestive and it has never acquired any distinctiveness in the minds of consumers.

280. The instruction "REMEMBER THIS NAME" has no conceptual or commercial strength

and no marketplace recognition.

281. Lundy never presented any basis for its allegation that including in its advertisements an instruction to "REMEMBER THIS NAME" had caused the phrase itself to acquire secondary meaning rendering it protectable under applicable trademark law.  Nor did Lundy present any evidence of actual confusion on the part of consumers to support its request for preliminary injunctive relief, despite the fact that the two phrases had been used concurrently in advertising for nearly a year before Lundy decided to file the Trademark Lawsuit.

282. On March 14, 2013, as a result of Lundy's initiation of the Trademark Lawsuit, an article titled "Pitt & Associates Sued by Lundy Law Over Firm Slogan" appeared in *The Legal Intelligencer*.  The article, which was widely circulated, essentially parroted Lundy's portrayal of Pitt as a trademark infringer.

283. Extensive briefing on Lundy's motion for preliminary injunction was also undertaken and the Court scheduled a hearing on the motion for the end of June, 2013 after oral depositions were to be taken.

284. On March 22, 2013, the parties served written discovery requests on each other, the responses to which were due by April 25, 2013.

285. On April 18, 2013, Manny Pokitolow, counsel representing Lundy Law, LLP in the Trademark Lawsuit, asked counsel for Pitt, Jackie Lesser, whether the fees and costs Pitt would incur in defending the Trademark Lawsuit would be paid by Pitt itself or by an insurance carrier. Counsel for Pitt responded that insurance coverage was available.

286. That same day, a few hours later, without explanation or any advance notice and after claiming under oath that Pitt was causing it "immediate and irreparable injury," Lundy voluntarily dismissed its Trademark Lawsuit against Pitt.  The case has been subsequently

marked closed by the Court.

287. Lundy filed the Trademark Lawsuit to make an example of Pitt, thereby trying to threaten and intimidate other competitors, as part of his overall scheme to preclude competitors from advertising their services in the relevant market or risk similar litigation by Lundy against them.

288. The intent and rationale behind the Trademark Lawsuit was that, by eliminating, undermining, neutralizing, or publicly disparaging Pitt's advertising, Lundy would achieve the dual purpose of reducing the effectiveness of a single competitor's advertising while simultaneously putting all other competitors on notice that any similar advertising that sought to regain market share or attract clients that Lundy wished to attract would potentially subject those competitors to the same expense and ordeal of well publicized litigation branding them a copyright infringer.

289. Lundy's predatory conduct in prosecuting the Trademark Lawsuit was thus calculated not to protect its purported trademark rights, but to deter and eliminate competing advertising, thereby allowing Lundy to compete on bases other than the merits.

### 4. Lundy's Predatory Scheme of Unethical and Illegal Referral Cash Payments by Doctors

290. Since at least 2006, Lundy Law has engaged in a scheme whereby it has referred hundreds of its clients to doctors or other healthcare providers in exchange for cash payments made by the doctors to a Lundy marketing employee at the direction of Leonard Lundy, for amounts of up to $800 per patient.

291. Lundy's ability to command such unethical and illegal cash payments from doctors is a result of his dominant position in the relevant market and his predatory conduct in excluding competing law firms from the most effective and efficient forms of advertising in the relevant

legal services market, as explained above.  Such payments are prohibited by 18 Pa.C.S.A. § 4117(b)(2)(3) (insurance fraud).

292. Because Lundy has become such an important source of patient referrals for doctors in the relevant legal services market due to his successful but false and misleading mass advertising, those doctors are willing to pay Lundy for his referrals, and many believe that their practices would not survive if they refused to make the payments, because a competing doctor would make them instead.  As Leonard Lundy has said, he has become successful in becoming the "predominant advertiser of personal injury services."

293. Lundy uses the substantial cash payments he receives from doctors to further fund his exclusive false and misleading advertising, divert more clients into its intake process, keep them away from competing law firms, sue those firms if they try to compete, and limit consumer awareness and choice.

294. Lundy's ability to command such payments reflects his power and undue influence in the relevant legal services market, because it demonstrates his status as the dominant source of both client and patient referrals.

295. By growing his market power over time through the collection of unethical and illegal cash payments from doctors on an increasingly large scale, Lundy precludes the entry into the market of competitors because they do not have access to the prime time advertising Lundy has prevented them from obtaining to obtain brand name recognition, and they are unwilling to act unethically or illegally in their referral practices, as Lundy has chosen to do.

296. As a result, Lundy's competitors, including Pitt, do not have the ability to collect payments from doctors for patient referrals and would not do so even if they wanted to. Therefore, Lundy's unethical and illegal conduct gives it an unfair advantage, harms

competition, harms consumers, and has created and maintains a monopoly for Lundy and his conspiring partners in the relevant legal services market.

**J.    Anticompetitive Harm Caused by Lundy's Exclusive Advertising Contracts and Other Predatory Conduct**

297. Lundy has used its conspiracy with Pond Lehocky and others, its long-term, de facto perpetually renewable exclusive contracts, sham litigation, illegal and unethical cash payments by doctors for client referrals, and other wrongful, predatory conduct, to attempt to monopolize and unreasonably restrain trade in the market for legal services by small personal injury and social security disability and workers' compensation law firms in the Greater Philadelphia Region.

298. Through its illegal exclusive dealing agreements and other wrongful, predatory conduct, Lundy has substantially foreclosed Pitt and others from effectively advertising, and therefore competing, for the provision of legal services in the relevant market.

**1.  Harm Caused to Pitt by Lundy's Predatory Conduct**

299. As a result of the predatory and illegal acts of Lundy, Pitt has been severely damaged through lost profits, higher costs and loss of goodwill and name recognition in the relevant legal services market.

300. Prior to Lundy's exclusive deal with SEPTA and Titan, Pitt placed advertisements on the exteriors of SEPTA buses from approximately 2006 until approximately  January 2012. After it was foreclosed from purchasing these advertisements due to Lundy's de facto exclusive automatically renewable exclusive contracts, and as a consequence thereof, Pitt's net income decreased.

301. Pitt's 2013 year-end total net income was approximately 5.6% lower than its 2012 year-end total net income.

57

302. Pitt's 2012 year-end total net income was approximately 15% lower than its 2011 year-end total net income.

303. Pitt's 2013 year-end total fees received in workers' compensation matters in 2013 were approximately 19.0% lower than its 2012 year-end total fees received in workers' compensation matters.

304. Pitt's 2012 year-end total fees received in workers' compensation matters were approximately 19.1% lower than its 2011 year-end total fees received in workers' compensation matters. Its 2012 year-end total referral fees for workers' compensation matters were approximately 13.4% lower than its 2011 year-end total referral fees for workers' compensation matters.

305. Before Lundy's exclusive advertising contracts were executed, Pitt's net income and fees received in workers' compensation matters typically increased year-over-year. For example, from 2008 to 2009 Pitt's net income increased by approximately 17.6%. Its fees received in workers' compensation matters increased by approximately 5.2%.

306. From 2009 to 2010, Pitt's net income increased by approximately 1.1%. Its fees received in workers' compensation matters increased by approximately 3.9%.

307. In 2008, Pitt received 142 client referrals based on SEPTA advertisements.

308. In 2009, Pitt received 160 client referrals based on SEPTA advertisements.

309. In 2010, Pitt received 197 client referrals based on SEPTA advertisements.

310. In 2011, Pitt received 146 client referrals based on SEPTA advertisements.

311. In 2012, after Lundy's exclusive deal with SEPTA/Titan began, Pitt received only 16 client referrals based on only interior SEPTA advertisements.

312. From January 1, 2013 through May, 2013, Pitt had received only 12 client referrals

based on only interior SEPTA advertisements. Further referral statistics for the year end 2013 are not yet available as of the date herein.

313. The decrease in Pitt's net income, yearly fees, and SEPTA-based referrals correlates directly with Lundy's execution of the exclusive advertising contracts.

## 2. Harm Caused to Competition by Lundy's Predatory Conduct

314. Defendants have also caused harm to competition generally among small personal injury, social security disability and workers' compensation law firms in the Greater Philadelphia Region.

315. For example, Leonard K. Hill was foreclosed from placing advertisements on the exteriors of SEPTA buses, because Lundy executed its exclusive deal with Titan and SEPTA before Leonard K. Hill even had a chance to attempt to purchase such advertisements, thereby negatively impacting his business.

316. Mr. Hill subsequently purchased less effective bus-interior advertisements, but they have proven to be of limited effect in improving his business.

317. As a result of Lundy's exclusive dealing, Mr. Hill has never been able to advertise on the exteriors of buses.

318. As another example, Rand Spear previously placed advertisements for his law firm on the exteriors of SEPTA buses for six years, and clients frequently stated that they learned about Mr. Spear's name and services from seeing his advertisements on the exteriors of buses. Mr. Spear has found that advertising on the interior of buses is not as effective as exterior ads and not cost justified.

319. As a result of being foreclosed from advertising on the exteriors of buses since 2011, Mr. Spear has lost prospective clients.

320. As a result of being foreclosed from advertising on the exteriors of buses, Mr. Spear, for example, has lost, in particular, workers' compensation and social security disability business.

321. The relevant legal services market is, and at all relevant times have been, highly concentrated. Lundy dominates this market. There are no viable reasonable substitutes for the advertising for which Lundy has secured exclusive deals.

### 3. Harm Caused to Consumers by Lundy's Predatory Conduct

322. Lundy's predatory and anticompetitive conduct also harms consumers. By obtaining exclusive control of the most effective and efficient forms of prime time advertising for small personal injury and social security disability and workers' compensation law firms, Lundy has established a stranglehold on the primary source of clients for such firms. In so doing, Lundy has limited consumer choice who are exposed to fewer name brand choices and seized the ability through increased market share, to increase the cost of legal services to clients.

323. On information and belief, Lundy has also begun charging clients contingency fees of, in small personal injury cases, 45% of any recovery obtained on behalf of the client.

324. Personal injury law firms generally work under contingent fee agreements whereby the fee paid to the law firm is equal to a percentage of any recovery the law firm obtains for the client.

325. Traditionally, the percentage such law firms charge is between 33 1/3% and 40%. The only constraint on contingent fees is a reasonableness standard imposed by the Pennsylvania Rules of Professional Conduct.

326. The vast majority of Lundy's competitors charge only 33 1/3%.

327. Lundy's 45% fee thus constitutes supra-competitive pricing that imposes an excessive cost on clients for representation in the areas in which Lundy purports to specialize.

60

328.   Lundy, through agreement with his advertising partners, has deceived the public into believing he handles workers' compensation and social security disability claims, when in fact, he refers this work out to competing law firms in return for payment to help fund his monopolistic advertising scheme.

329. If Lundy is permitted to maintain control over the primary source of clients for law firms such as Lundy and Pitt, Lundy will have free reign to continue increasing its contingent fees, thereby further artificially increasing the price of legal services in the relevant legal services market to consumers.

## COUNT ONE

### SHERMAN ANTITRUST ACT SECTION 2 – UNLAWFUL MONOPOLIZATION
### (15 U.S.C. § 2)
### (Against Lundy Law, LLP and L. Leonard Lundy)

330. Pitt re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 329 of this Second Amended Complaint.

331. Lundy has demonstrated monopoly power in the market for the provision of legal services for small personal injury and social security disability and workers' compensation law firms in the Greater Philadelphia Region, and has acquired and maintained this market power through exclusionary, predatory and other unjustified, illegal, and unethical business conduct, as opposed to a superior product, business acumen, or historic accident.

332. Lundy's unlawful monopoly power is demonstrated by the following facts:

   a.   Lundy is able to charge clients supra-competitive contingency fees of up to 45% when the market norm is 33% to 40%.

   b.   Lundy has demanded and received significant cash payments from doctors who make such payments for patient referrals because of Lundy's admitted dominant

market position.

c.  Lundy has received both referral fees and advertising fees from competing
advertising partner law firms who help maintain Lundy's market dominance in
return for clients solicited by the false and misleading advertising purchased
under Lundy's exclusive contracts.

333. Lundy has gained and maintained its illegal monopoly power through exclusionary
conduct, including but not limited to:

a.  Lundy's unlawful de facto exclusive contract renewable in perpetuity with Titan
at the same price that only Lundy has the right to terminate;

b.  other exclusive contracts in perpetuity with premium mass reach advertisers;

c.  false and misleading advertising of services Lundy does not provide or perform;

d.  agreements with advertising partner law firms to pay for referrals based on the
false advertising secured through Lundy's exclusive contracts; and

e.  filing objectively baseless lawsuits that are "a mere sham to cover what is actually
nothing more than an attempt to interfere directly with the business relationships
of a competitor" under the Noerr-Pennington[2] doctrine.

334. As a direct and proximate result of Lundy's unlawful conduct as described above, Pitt
and other competing situated law firms have been injured and continue to be injured in their
businesses and property in an amount to be proven at trial.

335. Lundy's unlawful activity has directly injured and continues to injure Pitt and other
competitors by substantially foreclosing them from offering competing legal services in the
relevant market, thereby diminishing their profits and their value as viable enterprises, and
raising their costs in order to effectively compete using less effective and efficient methods of

---

[2] *Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 315 U.S. 127, 144 (1961) (emphasis added).

advertising.

336. Lundy's anticompetitive and exclusionary conduct has injured competition and deprived consumers of advertising information about competing law firms, including Pitt and others, in order to choose legal representation.

337. Lundy's anticompetitive and exclusionary conduct has injured consumers by allowing Lundy to charge supra-competitive contingency fees up to 45%.

## COUNT TWO

### SHERMAN ANTITRUST ACT SECTION 2 – CONSPIRACY TO MONOPOLIZE
### (15 U.S.C. § 2)
### (Against Lundy Law, LLP and L. Leonard Lundy)

338. Pitt re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through Pitt re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 337 of this Second Amended Complaint.

339. Lundy and his advertising partner law firms combined and conspired to monopolize the market for the provision of legal services for small personal injury and social security disability and workers' compensation law firms in the Greater Philadelphia region by agreeing to contribute referral fees to Lundy in support of Lundy's exclusive advertising contracts in return for which the advertising partner law firms received client referrals and agreed not to advertise against Lundy on, at least, SEPTA buses.

340. Lundy and its advertising partner law firms engaged in overt acts with the specific intent to monopolize the market for the provision of legal services for small personal injury and social security disability and workers' compensation law firms in the Greater Philadelphia Region.

341. For the purpose of forming and carrying out this conspiracy, Lundy and its advertising partner law firms took the following actions, among others:

63

a. Lundy secured exclusive contracts for advertising which are de facto renewable in perpetuity, at Lundy's sole discretion, with Titan/SEPTA, BARTA, DART and New Jersey Transit, KYW News Radio and Wells Fargo Center.

b. Lundy's advertising included advertising for legal services that Lundy does not perform, *i.e.*, handling social security disability and workers' compensation claims.

c. When Lundy received inquiries from prospective clients based on its false and misleading advertising regarding legal services it did not perform, it referred those clients to advertising partner law firms in return for a referral fee and their agreement not to advertise against Lundy on SEPTA buses.

d. The advertising partner referral fees enabled Lundy to continue to pay for and maintain exclusive contracts on critical advertising outlets.

e. In addition, partner law firms de facto paid Lundy for advertising, which Lundy in turn used to allocate a portion of its advertising to the type of service performed by that partner firm.

f. As a result of this scheme, Pitt and other non-partner law firms were excluded from advertising on the critical outlets in which Lundy, on behalf of its advertising partners, had secured advertising.

342. As a direct and proximate result of Lundy's unlawful conduct as described above, Pitt and other competing law firms have been injured and continue to be injured in their businesses and property in an amount to be proven at trial.

343. The conspiracy to monopolize as described above has directly injured and continues to injure Pitt and other competitors by substantially foreclosing their ability to offer competing

services in media outlets in the relevant market, thereby diminishing their profits and their value as enterprises, and raising their costs in order to effectively compete using less effective and efficient methods of advertising.

344. The conspiracy to monopolize as described above has injured competition and deprived consumers of information about competing law firms, including Pitt and others.  There are no pro-competitive justifications for Lundy's conduct.

## COUNT THREE

**SHERMAN ANTITRUST ACT SECTION 2 – ATTEMPTED MONOPOLIZATION**
**(15 U.S.C. § 2)**
**(Against Lundy Law, LLP and L. Leonard Lundy)**

345. Pitt re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 344 of this Second Amended Complaint.

346. Lundy has acquired and sold the relevant product and/or services in interstate commerce and has engaged in the exclusionary and predatory conduct described herein through interstate channels in an attempt to monopolize the relevant legal services market described herein.

347. Lundy's exclusionary and predatory conduct, as described above, has been undertaken with the specific intent to create a monopoly in the legal services relevant market.  That conduct includes, but is not limited to:

 a. Lundy's unlawful exclusive contracts which are de facto renewable in perpetuity with Titan/SEPTA; BARTA; DART; New Jersey Transit; KYW News Radio; and Wells Fargo Center;

 b. other exclusive contracts with premium mass reach advertisers like KYW and Wells Fargo Center;

 c. false and misleading advertising of legal services Lundy does not provide or

perform;

d.   agreements with advertising partner law firms to unethically pay for client

referrals, based on the false and misleading advertising secured through Lundy's

exclusive contracts, agree to not run their own competing advertisements on

SEPTA buses and help pay for Lundy's SEPTA advertisements, which benefit

them; and

e.   filing objectively baseless sham litigation against Pitt and to send a threatening

and intimidating message to other competitors.

348. As a direct and proximate result of Lundy's unlawful conduct as described above, Pitt

and other similarly situated law firms have been injured and continue to be injured in their

businesses and property in an amount to be proven at trial.

349. Lundy's unlawful activities have directly injured Pitt and others as competitors by

obstructing their ability to offer competing services in media outlets in the relevant market,

thereby diminishing their profits and their value as enterprises.

350. Lundy's anticompetitive and exclusionary conduct has injured competition and deprived

consumers of information about competing law firms, including Pitt and others.  There are no

pro-competitive justifications for Lundy's conduct.

## COUNT FOUR

**SHERMAN ANTITRUST ACT SECTION 1 – UNLAWFUL EXCLUSIVE DEALING**
**(15 U.S.C. § 1)**
**(Against Lundy Law, LLP, L. Leonard Lundy, and Titan Outdoor LLC)**

351. Pitt re-alleges and incorporates as though fully set forth herein the allegations contained

in paragraphs 1 through 350 of this Second Amended Complaint.

352. Lundy's exclusive agreement with Titan for advertising which is de facto renewable in

perpetuity, at Lundy's sole discretion, for SEPTA has been for the provision of goods and services or other commodities (including advertising) for use, consumption, or resale within the United States.

353. The effect of each of Lundy's exclusive SEPTA advertising agreements, through Titan, is to unreasonably restrain trade and substantially lessen competition in the relevant legal services market in the Greater Philadelphia Region.

354. The exclusive contract between Lundy and Titan is a long-term exclusive contract that is de facto renewable in perpetuity for the same price at Lundy's discretion with no right of Titan or SEPTA to terminate unless the contract is found to be illegal by a court.

355. Lundy's first exclusive was executed on February 22, 2011 for "12 weeks exclusivity on reflective tails in all categories beginning 5/16/11. Full exclusivity of reflective tails in the law category." Reflective tails are advertisements on the back of buses.

356. On November 10, 2011 Lundy executed an exclusive contract with the following terms: "Lundy Law is to receive advertising exclusivity in the law firm category on the exterior of all SEPTA buses during the paid term of the contract 1/30/12- 12/30/12. Exclusive option to renew on 11/1/12 at same price. January 30, 2012-December 30, 2012 non-cancellable contract. No other lawyer may have an exclusive during Lundy Law paid contract time of exclusivity."

357. Lundy had the exclusive option to renew at his sole discretion, and he did so on or about October 16, 2012.

358. Following that renewal, Lundy continued to have the exclusive right to renew, and he did so in the fall of 2013 for the 2014 year, at the same price as the previous three years.

359. On each occasion, no competing law firm was permitted to bid against Lundy, even though the terms of Lundy's exclusive contract gave Lundy the right to renew at the price of the

previous contract. For example, attorney Leonard K. Hill asked how long Lundy's advertising deal would continue. He was told by Titan's Jon Roche "underbar{forever}." When Rand Spear offered to pay Titan more than Lundy had for the exclusive contract, Titan's Jon Roche rejected such higher offer saying Lundy has the deal "forever."

360. In addition to foreclosing competing law firms from advertising on the exteriors of buses as long as Lundy exercises his exclusive right to renew at the same price, the exclusive contract is an unreasonable restraint of trade in the following ways:

      a.  Lundy's exclusive contract provides, "No other lawyer may have an exclusive during Lundy Law paid contract time of exclusivity." This provision serves only an exclusionary purpose: preventing Pitt or any other law firm from obtaining an exclusive on bus interiors, bus stands, or any other form of advertising on SEPTA.

      b.  The value of the November 2011 exclusive SEPTA contract for Lundy was $435,000. Titan expected only that the "additional annual revenue is 100K net from other legal advertisers" who could no longer advertise on the exterior of buses or have an exclusive on any other form of SEPTA advertising. Lundy's exclusive contract in perpetuity also gave him approximately $250,000.00 of free bonus advertising. This gave Lundy many times the advertising clout on SEPTA as all other law firms combined.

      c.  Lundy's exclusive SEPTA contract bonus material, included 1,500 interior card advertisements. While other buyers of advertising also received bonus material with a paid purchase, the magnitude of Lundy's bonus material (based on the premium price paid for his exclusive) allowed him to dominate even the interiors of buses, and/or dilute the advertising message of any competitor.

    d.  The account executive handling SEPTA advertising at Titan is Lundy's daughter. This insider allowed Lundy to obtain competitive intelligence on his competitors, making the actual execution of this exclusive contract even more unreasonable. Titan consistently rejected any challenge to her handling accounts of her father's competitors as a conflict of interest.

361. Titan recognizes that "[t]he ultimate mass reach medium, Exterior Bus advertising is the most colorful, dynamic and cost-efficient form of advertising available today" and Titan was itself concerned about the legality the exclusivity provided to Lundy with this exclusive contract. In a December 7, 2011 letter to Lundy, Jon Roche General Manager of Titan wrote, "We wanted to clarify that in the event either Titan or a [sic] Septa is enjoined by a third party from providing exclusivity to Lundy Law, Lundy Law/Titan Contract shall be terminated as to exclusivity and the Lundy Law/Titan Contract may be terminated or renegotiated at the option of Lundy."

362. When Pitt sought further e-mails of Jon Roche pursuant to a request under Pennsylvania's Right to Know Law Request, Pitt was informed that Roche's e-mails prior to August 2012 had been "lost," as had the e-mails of other relevant Titan employees, after Titan and SEPTA believed litigation was possible. This raises an adverse inference, at a minimum, against Titan.

363. Titan has acted economically irrationally in locking itself into a perpetually exclusive contract at the same price unless Lundy decides to terminate, which prevents open competitive bidding which would result in higher revenues, as is permitted by statute, and Titan has further rejected higher prices offered by competitors, which conduct is economically irrational.

364. As a direct and proximate result of Lundy's and Titan's commonly shared unlawful conspiratorial conduct, which benefits Lundy but harms competition, Pitt and other similarly

situated law firms have been injured and continue to be injured in their businesses and property in an amount to be proven at trial.

365. Lundy's and Titan's unlawful activities have directly injured Pitt and other competitors by substantially foreclosing their ability to offer effective advertising in SEPTA outlets for competing legal services, thereby diminishing their profits and their value as enterprises.

366. Lundy's and Titan's anticompetitive and exclusionary conduct has injured competition and deprived consumers of information about competing law firms, including Pitt and others. The anticompetitive effects of Lundy's and Titan's conduct far outweigh any pro-competitive justification.

367. Lundy and Titan share a unity of purpose in harming Pitt and other competitors by and through their illegal conduct, shown by Titan's litany of economically irrational conduct, as described herein.

## COUNT FIVE

### VIOLATION OF THE LANHAM ACT
### (15 U.S.C. § 1051 *ET SEQ.*)
### (Against Lundy Law, LLP and L. Leonard Lundy)

368. Pitt re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 367 of this Second Amended Complaint.

369. Lundy has made false or misleading statements in advertisements regarding the legal services it provides, including, but not limited to, representing to consumers that it handles workers' compensation and social security and disability matters when it does not handle such matters itself.

370. Lundy's statements actually deceive or at least have a tendency to deceive a substantial portion of their intended audience.

371. The deception is material in that it is likely to influence the decisions of potential clients to engage Lundy rather than engaging another competing law firm, like Pitt and other similar firms.

372. The legal services Lundy advertises affect interstate commerce because the advertisements run in Pennsylvania, New Jersey, and Delaware, and Defendant Lundy Law, LLP, a Pennsylvania limited liability partnership, actively seeks out potential clients in all three states.

373. Lundy's false statements have injured, and are likely to continue to injure, Pitt and others by causing a decline in revenue, loss of good will, and other harm in an amount to be determined at trial, including, as an alternative, the disgorgement of profits illegally obtained by Lundy as a result of its false and misleading statements.

**COUNT SIX**

**PENNSYLVANIA COMMON LAW – UNFAIR COMPETITION**
**(Against Lundy Law, LLP and L. Leonard Lundy)**

374. Pitt re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 373 of this Second Amended Complaint.

375. Defendants Lundy Law, LLP and L. Leonard Lundy have, as described above, engaged in conduct, which is contrary to honest industrial and commercial practice and, thus, has engaged in unfair competition, in violation of the common law of the Commonwealth of Pennsylvania.

376. Lundy's acts are calculated to procure an unfair competitive advantage through false, misleading, and deceptive advertising, entering into intentionally restrictive exclusive advertising contracts, filing sham litigation, demanding and receiving illegal and unethical referral payments from doctors, and other predatory and unfair conduct described herein.

377. Lundy's unfair methods of competition using its dominant market position as described

herein, which has substantially interfered with the ability of Pitt and other competitors in the

defined legal services market, to compete against Lundy on the merits of the legal services they

provide, include, but are not limited to, the following:

    a.  By falsely stating in its advertisements that it handles social security disability and

workers' compensation, Lundy has engaged in a "bait and switch" scheme

whereby it lures prospective clients into its intake process under false premises

and then sells their intake information to co-conspirators for a fee.  These false

advertisements preclude and displace potential legitimate and honest advertising

by Lundy's competitors.

    b.  By collecting substantial  unethical and illegal cash payments of up to $800 per

patient from doctors in exchange for Lundy referring its clients or prospective

clients to those doctors, Lundy places itself in an unfairly advantageous position

from which it can fund advertising and other operational costs using illegal cash

funds that competitors do not have, as well as obtain other advertising benefits

and bonuses not obtainable by its competitors.

    c.  By locking up in perpetuity, the exclusive rights to the most effective and efficient

forms of advertising for small personal injury and social security disability and

workers' compensation law firms, Lundy has eliminated competition on the

merits by precluding competitors from purchasing the advertising necessary to

obtain brand name recognition, thereby excluding them from the critical sources

of client referrals.

    d.  By filing baseless and predatory sham litigation against Pitt for an improper

purpose, *i.e.*, to cause financial and reputational harm to Pitt, and send a

threatening message to competitors, Lundy has sought to compete on a basis other

than the merits and in a manner that undermines honest competition.

378. All of the above acts constitute unfair methods of competition, taking into account the

nature of the conduct and its likely effect on both Pitt and the public.

379. Defendants Lundy Law, LLP and L. Leonard Lundy have engaged in the

aforementioned acts willfully and deliberately and their conduct has caused injury to Pitt as well

as to other competing law firms and the public.

380. As a result thereof, Pitt has been directly injured in an amount to be determined at trial,

including, as an alternative, the disgorgement of profits and cash referral payments illegally

obtained by Lundy as a result of its unfair competitive conduct.

381. Lundy's anticompetitive and predatory conduct has injured competition and deprived

consumers of information about competing law firms, including Pitt and others.  The

anticompetitive effects of Lundy's conduct far outweigh any pro-competitive justification.

## COUNT SEVEN

### PENNSYLVANIA COMMON LAW – TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACT
### (Against Lundy Law, LLP and L. Leonard Lundy)

382. Pitt re-alleges and incorporates as though fully set forth herein the allegations contained

in paragraphs 1 through 381 of this Second Amended Complaint.

383. Defendants Lundy Law, LLP and L. Leonard Lundy, through their illegal exclusive and

restrictive advertising contracts and other anticompetitive predatory conduct, tortiously interfered

with Pitt's prospective contracts with SEPTA, BARTA, KYW Newsradio and the Wells Fargo

Center.

384. Pitt historically contracted with all of these media outlets and had a reasonable anticipation of being able to renew those contracts, which was more than a mere hope. For example, Pitt has purchased exterior ads on buses from SEPTA since 2006, and would and could have renewed with Titan/SEPTA in 2012, 2013 and 2014, to do so, but for Lundy secretly obtaining an exclusive contract for such ads in 2011.

385. Defendants Lundy Law, LLP and L. Leonard Lundy secretly entered into illegal exclusive and restrictive advertising contracts with these media outlets with the purpose and intent of tortiously interfering with Pitt's prospective relationships with them.

386. Lundy's intent to harm Pitt's prospective relationships is demonstrated by the following facts:

    a.  Lundy's objective in securing illegal exclusive advertising rights, using illegally and unethical cash referral payments from doctors, was not to increase its visibility in the relevant market, but to deceive prospective clients into entering its intake process so that it could divert them to its co-conspirators and away from competitors such as Pitt.

    b.  Lundy's advertisements falsely state that Lundy provides services that it does not actually provide, and that firms such as Pitt do actually provide. Therefore, the purpose and effect of the advertisements is to eliminate advertisements of competing services, and to prevent future contracts between the advertising providers and law firms in the relevant market that seek to purchase legitimate advertising for their own services;

    c.  Pitt's communications to date with Titan have indicated that the reason Pitt can no longer purchase SEPTA bus-exterior advertisements is not because Titan did not

74

wish to sell the advertisements, or would not otherwise have sold the advertisements to Pitt as it had done in the past, but because Lundy's exclusive deal foreclosed the sale of any bus-exterior advertisements to any of Lundy's competitors.

d.  Lundy negotiated a renewal clause in each of the contracts that made them perpetually renewable, so that it illegally could have the exclusive rights "forever" at the same price.

e.  Nothing in the illegal exclusive contracts provides for or contemplates any opportunity for a competitor to submit its own bid for the exclusive advertising rights, so it is not possible for a competitor to approach Titan at the expiration of the term of one of Lundy's contracts and offer to pay more to secure the same exclusive rights in the following year.  Pitt's recent unsuccessful attempt to renew its contract with SEPTA for the exterior of buses evidences that Pitt would and could have renewed its contract with SEPTA for exterior ads but for Lundy's predatory and tortious conduct.

387. There is no privilege or justification for Lundy's actions.

388. Pitt has suffered actual damages as a result of Lundy's actions in the form of lost revenue, loss of good will, and other harm in an amount to be determined at trial.

## COUNT EIGHT

### VIOLATION OF PENNSYLVANIA'S DRAGONETTI ACT
### (42 Pa. C.S.A. § 8351)
### (Against Lundy Law, LLP and L. Leonard Lundy)

389. Pitt re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 388 of this Second Amended Complaint.

390. Lundy engaged in wrongful use of civil proceedings by improperly employing baseless litigation as a competitive weapon against Pitt. The Trademark Lawsuit had no legitimate purpose and was brought primarily, if not solely, to cause Pitt financial and competitive harm, not to obtain an adjudication of the parties' respective rights.

391. Lundy procured, initiated, and continued the Trademark Lawsuit by threatening the action, filing the complaint, moving for a preliminary injunction, engaging in costly briefing, and serving written discovery, all at great expense to Pitt.

392. Lundy, through its counsel, initiated the Trademark Lawsuit in a grossly negligent manner and/or without probable cause.

393. Had Lundy and its counsel cursorily reviewed the facts and the applicable law, they would have known that marks of the type for which Lundy claimed protection in the Trademark Lawsuit are generic and descriptive and, therefore, not entitled to the protection of the trademark laws.

394. Lundy could not reasonably have believed that, under the facts alleged, their claim could be valid under existing or developing law, and Lundy either did not seek in good faith the advice of counsel regarding the purported claims or did not disclose all relevant facts to counsel.

395. Lundy's counsel could not have believed in good faith that initiation and/or continuation of the Trademark Lawsuit was not intended merely to harass or maliciously injure Pitt. Lundy's

improper purpose in bringing and continuing the Trademark Lawsuit is demonstrated by Lundy's abrupt dismissal of the case, on its own initiative, after its counsel found out from Pitt's counsel that Pitt's legal fees and costs would be paid by an insurance carrier and not by Pitt itself.

396. Lundy brought the Trademark Lawsuit primarily for purposes other than that of securing the proper discovery, joinder of parties, or adjudication of the claim in which the proceedings were based.

397. Those purposes included, but were not limited to: (1) forcing Pitt to waste its own funds on a defense, (2) shutting down Pitt's advertising, (3) intimidating Pitt into changing its firm slogan, and (4) disparaging Pitt on the public record.

398. The Trademark Lawsuit was terminated in Pitt's favor when Lundy voluntarily and unilaterally dismissed the case in its entirety on April 18, 2013.

## PRAYER FOR RELIEF

WHEREFORE, Pitt respectfully prays that:

399. This Court enter judgment that:

      a.      Defendants Lundy and Titan have violated the Sherman Antitrust Act;

      b.      Defendants Lundy Law, LLP and L. Leonard Lundy have violated the Lanham Act;

      c.      Defendants Lundy Law, LLP, and L. Leonard Lundy have engaged in unfair competition at common law;

      d.      Defendants Lundy Law, LLP, and L. Leonard Lundy have engaged in tortious interference with prospective contract; and

      e.      Defendants Lundy Law, LLP, and L. Leonard Lundy have violated Pennsylvania's Dragonetti Act.

400. This Court award monetary damages sustained by Pitt from Defendants Lundy and Titan, jointly and severally, including as a result of injury due to Defendants' violations of the Sherman Antitrust Act in amounts to be ascertained at trial, such amounts to be automatically trebled pursuant to Section 4 of the Clayton Act.

401. Defendants Lundy Law, LLP and L. Leonard Lundy be required, in the alternative, to account for and pay to Pitt all profits and attorney and doctor referral payments (whether declared as income or not) realized by Lundy and his agents as a result of the illegal and unethical acts complained of herein, pursuant to Pennsylvania common law and the Lanham Act.

402. This Court award to Pitt recovery of the costs of the instant suit, including its reasonable attorneys' fees and costs incurred herein, the fees and costs incurred in the prior baseless lawsuit filed by Defendant Lundy against it, as well as damages for the harm to Pitt's reputation caused

by the prior highly publicized lawsuit, referenced herein.

403. This Court award punitive and exemplary damages to Pitt based on Defendants Lundy Law, LLP and L. Leonard Lundy's outrageous conduct.

404. This Court enter an injunction and related consent decree enjoining Defendants' illegal conduct.

405. This Court award such other, different and further relief as the Court may deem just, equitable and proper.

**DLA Piper LLP (US)**

By: _____

Carl W. Hittinger (Bar No. 30250)
Lesli C. Esposito (Bar No. 201916)
Robert E. Connolly (Bar No. 32341)
Adam D. Brown (Bar No. 205899)
DLA Piper LLP (US)
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA
T: 215-656-2449
F: 215-606-2149
carl.hittinger@dlapiper.com
lesli.esposito@dlapiper.com

Date:  January 2, 2014

*Attorneys for Plaintiff*
*Larry Pitt & Associates*

## <u>VERIFICATION</u>

I, Larry Pitt, am authorized to make this Verification on behalf of Plaintiff Larry Pitt &
Associates.  I declare under penalty of perjury that the facts set forth in the foregoing Second
Amended Verified Complaint are true and correct to the best of my personal knowledge and
information.  I am aware that if any of the foregoing statements made by me are willfully false, I
am subject to punishment.

Dated: _1/2/14_

_____
Larry Pitt

## CERTIFICATE OF SERVICE

I, Carl W. Hittinger, hereby certify that on January 2, 2014, I caused the foregoing

Second Amended Verified Complaint to be served via express Mail and electronic mail upon the

following:

> Robert C. Heim, Esquire
> Carolyn M. Hazard, Esquire
> Brian P. Savage, Esquire
> Dechert LLP
> Cira Centre
> 2929 Arch Street
> Philadelphia, PA 19104-2808

> *Attorneys for Defendants Lundy Law, LLP and Leonard L. Lundy*

_____
Carl W. Hittinger